EXHIBIT B

**Page 1**

```
 1
 2
 3
 4
 5
 6
 7
 8              TRANSCRIPT OF A HEARING BEFORE THE
                WASHINGTON STATE GAMBLING COMMISSION
 9                     AUGUST 9, 2018
10
11    IN RE:  PETITION OF BIG FISH GAMES, INC. FOR A
      DECLARATORY ORDER
12
13
14
15
16
17
18
19
20
21
22    Transcribed by:
      Christine Aiello
23
      Job No. J2609271
24
25
```

**Page 2**

```
 1            A P P E A R A N C E S
 2    EMILY JOHNSON HENN, ESQ.
      Covington & Burling LLP
 3    333 Twin Dolphin Drive
      Redwood Shores, CA 94065
 4    (650) 632-4715
      On behalf of Big Fish Games, Inc.
 5
      ALEXANDER G. TIEVSKY, ESQ.
 6    Edelson PC
      350 North LaSalle Street, 14th Floor
 7    Chicago, IL 60654
      (312) 589-6379
 8    On behalf of Cheryl Kater
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                     INDEX
                                           Page
 2
      Colloquy                              4
 3
 4
 5
 6
 7
 8
 9
10              INDEX TO EXHIBITS
11         Description              Page
12    None offered.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            P R O C E E D I N G S
 2    (On the record)
 3       CHAIR SIZEMORE:  We have Big Fish Games,
 4    Incorporated, a petition for declaratory order.  And
 5    this is continued from our July meeting.
 6       MR. CONSIDINE:  Correct.
 7       CHAIR SIZEMORE:  And I know that we made
 8    requests for additional information at that July
 9    meeting and we got a lot and some of it was just in the
10    last few days.
11       So I'll let you, Brian, kind of run this,
12    steer us through this process; and -- and we'll --
13    we'll work through it.
14       MR. CONSIDINE:  Thank you, Mr. Chair.
15       And for the record again, Brian Considine,
16    legal and legislative manager.  I figure I'll give a
17    brief overview as kind of what I see as maybe the best
18    way to -- to do this, especially to create a helpful
19    record moving forward.  But you're right, we had our
20    July meeting, and at the July meeting, Mr. Chair, you
21    came out and you asked three things, but really two
22    very specific things was for information related to a
23    thing of value and what it means under Washington State
24    law based on the parties' reading of it; and two, what
25    constitutes a necessary party in our law and the
```



Page 5

1  rule -- and then I quote the rule in the memo, and I'm
2  not going to go through all of that unless you want me
3  to, and then any other factors you believe the
4  Commission should receive.
5          And so then based off of that, I think it's
6  just quickly to read into the record, but what I
7  figure, we'll go through the documents that we have,
8  see if there's any questions related to that.   Then
9  we'll take the, what I'm calling the procedural issue
10 first, the necessary party.   Because of the way that
11 the law is written, if somebody is a necessary party,
12 you are prevented from moving forward with a
13 declaratory order.   And so we'll -- I'll quickly brief
14 that.
15         We'll have any parties -- Ms. Brinkmann is --
16 could not make it today, but another attorney in her
17 firm, Emily Henn, is here, and she'll be presenting
18 on -- on behalf of the petitioner.   Mr. Tievsky is
19 still here for Ms. Kater.   And then only specifically
20 talk about necessary party.   Anybody else after those
21 two individuals want to talk, clearly you'll have
22 public comment.   Kind of close the comment on -- on
23 necessary party and then move to thing of value.
24 That's the more substantive meat of the issue.
25         Have the same sort of thing, the petitioner

Page 6

1  will go first, Mr. Tievsky, anybody else; and then see
2  if there's any other topics that you want some extra
3  comment or -- on.   And of course you'll know how to ask
4  questions on all of that.   And the parties are ready to
5  answer your questions as best as possible.   So that --
6  that's kind of my plan for -- for today.
7          And then after you feel you've received
8  everything that you need, you've asked all the
9  questions, you'll be able to go into closed session,
10 just like last time, with our AAG Mr. Kernutt and be
11 able to have your conversation and come out and -- and
12 announce kind of how you would like to move forward or
13 if you want to make a decision.
14         And I'm happy to save kind of the procedural
15 posture at the end, but just up front, the same options
16 that were before you last month are the same options
17 before you this month.   And I'm happy to run through
18 them before you break for your closed session.
19         CHAIR SIZEMORE:   Okay.   And, Brian, before you
20 move on to the next, I just informally I guess I would
21 like to ask those that will be coming forward on this
22 topic, do you anticipate needing more than ten minutes?
23         MS. HENN:   No, I think that would be adequate
24 time to address --
25         CHAIR SIZEMORE:   Okay.

Page 7

1          MS. HENN:   -- the issues.
2          CHAIR SIZEMORE:   Okay.
3          MS. HENN:   Thank you.
4          CHAIR SIZEMORE:   Mr. Tievsky.
5          MR. TIEVSKY:   If I -- it depends on how many
6  questions the Commission has.
7          CHAIR SIZEMORE:   Sure.
8          MR. TIEVSKY:   For -- for my initial
9  presentation, no, certainly not.
10         CHAIR SIZEMORE:   Okay, thank you.
11         MR. CONSIDINE:   And just so I can put it on
12 the record, both representatives said that ten minutes
13 should be sufficient, but it depends on questions and
14 kind of how --
15         CHAIR SIZEMORE:   Okay.
16         MR. CONSIDINE:   -- it goes.
17         CHAIR SIZEMORE:   Sure.
18         MR. CONSIDINE:   So quickly running through
19 what's in your packet, because there was a lot of
20 things that came in, Tab A, I believe, should be the
21 transcript that felt it was probably helpful to have
22 the transcript from just -- it's not the full meeting,
23 it's just the portion that dealt with the petition.
24         Tab B is all of the documents that you had
25 before you at the July meeting, so that would be the

Page 8

1  petition from Big Fish and the letters from Double
2  Down, Incorporated, and I think Huge, Incorporated,
3  on -- in favor of the petition, and then Ms. Kater's
4  comments as well.
5          Tab C should be a citizen, I -- she has
6  identified that she lives in Texas.   It -- she
7  submitted the consumer protection complaint with the
8  Attorney General's Office.   And then after that was
9  completed, I believe the AG's office let her know that
10 we had this petition going on, so she wanted to submit
11 all of the documents under Tab C as her comment, but
12 she's not expected to appear today or -- or, I don't
13 think, at all.
14         D, Tab D should be the petitioner's response
15 to your questions related to necessary party and thing
16 of value.   Tab E should be Ms. Kater's response on --
17 Mr. Tievsky's response on Mr. -- on behalf of Ms. Kater
18 that also deals with thing of value and necessary
19 party.
20         Tab F should be a statement from a woman
21 named Susie Kelly relating to her customer experience
22 with, I believe, Big Fish Casino.   Tab G should be a
23 letter submitted by the Entertainment Software
24 Association.   And as a frame of reference, I know
25 Commissioner Stearns is very familiar with ESA because

Page 9

1  they are the trade association for Nintendo and
2  Microsoft and other software video game companies, who
3  we have had lots of conversations with, good
4  conversations, they've been very, very good at being
5  available on the skins and loot box issues that we
6  dealt with last year.  So they submitted a letter, I --
7  I believe, in support of Big Fish's petition.
8        And then two more documents that came in that
9  I put at your place this morning.  The first one is a
10 letter from an individual who wished to remain
11 anonymous on the record because of a fear of just being
12 outed on a record for, I think, her work or her family
13 or something like that, the embarrassment.  And so
14 anyway, this was submitted through Mr. Tievsky.  And so
15 he might be able to -- he might be able to answer any
16 questions related to the letter, but it's the double --
17 it's the one-page double-sided that starts with, dear
18 commissioners.
19       VICE CHAIR PATTERSON:  I was just puzzled
20 about the letter because it was anonymously provided,
21 but in the letter I read that this individual said that
22 they looked forward to telling us more about their
23 experience next week.  How --
24       MR. CONSIDINE:  Yeah.
25       VICE CHAIR PATTERSON:  How would that happen?

Page 10

1        MR. CONSIDINE:  Yes.  So Mr. Tievsky -- this
2  was submitted through Mr. Tievsky, so he probably has a
3  better ability to tell you about this individual.  I
4  know she wanted to appear by -- actually appear in
5  person today.  I believe she's a Washington resident,
6  and something came up, so she couldn't make her way to
7  Pasco.
8        VICE CHAIR PATTERSON:  Thank you.
9        MR. CONSIDINE:  The second letter that you
10 received has an NYU watermark at the top, multipage,
11 from Dr. Schull.  Dr. Schull is the person that
12 Mr. Tievsky had mentioned an -- that wrote the book --
13       VICE CHAIR PATTERSON:  Uh-huh.
14       MR. CONSIDINE:  -- that you had inquired to
15 get a reference from.  So she submitted comments as
16 well.  And as of -- I haven't checked this morning, but
17 as of yesterday, those are the all -- all the comments
18 that, I believe, we've received so far based off of
19 either your questions or knowing that there was still a
20 comment period on the petition.
21       And so moving forward, unless there's any
22 questions about the documents, I think we'll get into
23 the necessary party topic.  Or --
24       COMMISSIONER STEARNS:  I --
25       MR. CONSIDINE:  Yes.

Page 11

1        COMMISSIONER STEARNS:  So basically when
2  you're -- you're talking about the RCW 34.05.240 where
3  it says that the agency may not enter a declaratory --
4  it's -- it's under, I don't know, it was --
5        MR. CONSIDINE:  Uh-huh.
6        COMMISSIONER STEARNS:  -- in section seven
7  where an agency may not enter a declaratory order that
8  would substantially prejudice the rights of a person
9  who would be a necessary party?
10       MR. CONSIDINE:  Correct.
11       COMMISSIONER STEARNS:  So I -- just -- just as
12 you go along, just keep in mind that I'd -- I'd also
13 like to more what -- about the first part where it says
14 prejudice of rights.
15       MR. CONSIDINE:  Okay.
16       COMMISSIONER STEARNS:  So if you could just
17 also explain to us what that means, that
18 (indiscernible).
19       MR. CONSIDINE:  Right.  And I think that's,
20 you know, it's a little bit unique position for me
21 because you know I love and try and explain things
22 based off of my thought, because staff is not really
23 kind of a party to this, I think that is a question
24 and -- and I think the attorneys probably heard that as
25 well, that that first part is something that they

Page 12

1  should be focused on when they're telling you what they
2  think it -- it should be.
3        So --
4        VICE CHAIR PATTERSON:  For the non-attorneys,
5  could you -- could you talk about what you're talking
6  about in a little bit different way?
7        MR. CONSIDINE:  Sure.  This is the same issue
8  as to whether or not the Commission -- whether or not
9  basically somebody has -- is a necessary party to the
10 action and consents to you making the decision.  So
11 what you've heard previously is that Ms. Kater believes
12 she's a necessary party because she is a plaintiff in
13 lawsuits against Big Fish petitioner and that this will
14 negatively impact her case if you issue a declaratory
15 order as the petitioner has requested, which is to say
16 this -- what they do is not gambling, which would in
17 some ways though -- that was federal court, this is --
18 we're clearly a state agency related to kind of state
19 court issues, but if you say it's not gambling, would
20 be argued -- or Mr. Tievsky can talk more about it, but
21 what he had said at the July meeting was that it would
22 undercut what the Ninth Circuit said.
23       And so they still -- kind of -- they still
24 have a case.  This could potentially make their case go
25 away because the -- the intent would be for any party

Page 13

1  that this Commission is set to interpret the state law
2  would say, the Gambling Commission says this is not
3  gambling, so you can disregard that the Ninth Circuit
4  said because we'll get into the facts and this is what
5  you can apply.  And that's a really generic summary.
6      VICE CHAIR PATTERSON:  That's -- I got it.
7  Thank you.
8      MR. CONSIDINE:  Yeah.
9      COMMISSIONER STEARNS:  Yeah, and what I was
10  going to add was --
11      COMMISSIONER TROYER:  I --
12      COMMISSIONER STEARNS:  -- there were three
13  things there.
14      MR. CONSIDINE:  Right.
15      COMMISSIONER STEARNS:  -- prejudice of rights,
16  necessary party, consent of right.
17      MR. CONSIDINE:  Right.  Yeah, and -- and that
18  was some of the conversation that I know Ms. Brinkmann
19  and Mr. Tievsky had with you before is -- is, are they
20  substantially prejudiced and what does that mean.  And
21  my expectation is that both Ms. Henn for Big Fish and
22  Mr. Tievsky should be able to go into that a little
23  bit.
24      COMMISSIONER STEARNS:  Thank you.
25      COMMISSIONER TROYER:  There are a lot of

Page 14

1  lawyers, and I only know them not to be dangerous.  But
2  as we're taking a look at this, instead of trying to
3  regulate it to just this particular case and this
4  particular incident with these people, I think we have
5  a way bigger overall picture to take a look at, and
6  there's a lot more to this than who wins or loses
7  between these two people in court.  I think the
8  decision that we make and what we look at here could
9  have long lasting effects on everybody for a long time
10  to come.
11      And I understand that you're -- you are kind
12  of looking at this as a legal issue or a legal motion,
13  but I think that we have the ability to do some type of
14  investigation with people on our staff that know more
15  than we know and -- and -- and understand it and take a
16  bigger overall look at this whole entire problem and
17  not make a decision based on their arguments.
18      Because this is going to affect a lot of
19  people, a lot of money, and it's a lot of -- a lot
20  of -- a lot to contemplate.  So I just don't want to
21  keep it narrowed down to just -- just this.  I want to
22  take a bigger overall look at the picture, everything,
23  the problem gambling, the -- the issues on the back end
24  of all this, and what does the legislator -- what --
25  what legislators think of this.  The governor's office,

Page 15

1  what do they think?
2      Is it an expansion of gambling or not an
3  expansion of gambling.  I mean, millions of dollars in
4  numbers that I've been reading about, but yet, you
5  know, we're -- we're (indiscernible) around with paper
6  pull tabs and everything else.  And -- and anybody
7  brings up the word video monitor for a pull tab game,
8  and they're -- the lobbyists and everybody go crazy;
9  but just handing this over without really thinking it
10  through and looking at it in an overall view to decide
11  this case I think is dangerous.
12      MR. CONSIDINE:  Well, and, Commissioner
13  Troyer, you're correct that Big Fish has brought before
14  you just a petition related to their game.  And we
15  know, just based off of litigation, that there's four
16  or five at least and probably more companies that would
17  at least tangentially be affected by that.
18      COMMISSIONER TROYER:  Uh-huh.
19      MR. CONSIDINE:  So I think that that is
20  something that is incredibly -- it's something that you
21  can talk with AAG Kernutt when you're in closed
22  session, but I think it's something that is appropriate
23  to have that discussion as to whether or not you want
24  to do this kind of a company-by-company basis or
25  whether or not you want to take a larger kind of view

Page 16

1  of this.  And you can use that as how you determine how
2  you want to move forward.
3      VICE CHAIR PATTERSON:  How we want to move
4  forward versus how we would recommend the legislature
5  move forward?
6      MR. CONSIDINE:  I would say how you want to
7  move forward can be how you think we should advise the
8  legislature to move forward.  I mean, that's part of
9  it.  And I guess going back to the procedural, which I
10  probably should have started with is, you know, you can
11  say -- you can agree with the petition.  You don't --
12  it's not kind of like the rules petition where you say,
13  yes, we'll agree to do what you -- you know, to engage
14  in that specific rulemaking.
15      This is left to you to say -- they want you
16  to say it's not gambling.  You could go the other way,
17  and we talked about that in July, you could determine
18  that it is gambling.  You can also have that third
19  option that says, we, for these good reasons, don't
20  feel that we're going to issue -- we don't feel it's a
21  good idea to issue a declaratory order.
22      And then part of that is, just because you
23  don't issue a declaratory order doesn't mean that you,
24  as commissioners, can direct me or others to have these
25  conversations with legislators, to reach out to our

Page 17

1  ex-officio and our committees, much like we did with
2  skins and loot boxes last year and other topics that
3  have come before us where we think there needs to be
4  some education with the legislature and some
5  exploration on the issue.
6       VICE CHAIR PATTERSON:  Mr. Chair.
7       CHAIR SIZEMORE:  Yes.
8       VICE CHAIR PATTERSON:  I think this is a great
9  example of how our Commission could provide a great
10 service to the legislature.  This is an area where we
11 could give advice on this topic.  So I know that this
12 is one of our goals and our strategic plan is to
13 improve our relationship with the state legislature and
14 to interact more meaningfully with them.  So I just
15 wanted to say that this potentially could be one of
16 those topics.
17       MR. CONSIDINE:  It --
18       CHAIR SIZEMORE:  Well, no, I'm -- I'm -- was
19 just going to say, I mean, we are being asked to --
20 to --
21       VICE CHAIR PATTERSON:  Right.
22       CHAIR SIZEMORE:  -- you know, make a
23 declaratory order.  I think certainly the -- the
24 discussions that we have and ultimately the decision
25 that is made will -- will, you know, spur a lot of next

Page 18

1  steps, whether it is with the legislature or, you know,
2  some other avenue.  So you know, at this point, yeah, I
3  mean, we are being asked to act and we have the, you
4  know, the option to act the way they want us to, act
5  the opposite way they want us to, or not act at all for
6  good cause.  So -- so those are our options.
7       VICE CHAIR PATTERSON:  If I -- I guess what
8  I'm thinking is if -- I don't -- let's -- I'll wait and
9  to --
10       CHAIR SIZEMORE:  Yeah.
11       VICE CHAIR PATTERSON:  -- see what we're going
12 to do.
13       MR. CONSIDINE:  Yeah.  What my
14 recommendation --
15       Sorry, go ahead, Senator.
16       SENATOR CONWAY:  No, I just want to -- I just
17 have a question here since we're bringing in the
18 legislature here.  What would be helpful is to
19 understand what other states have been doing around
20 these issues as well.  And I'm hoping that maybe you
21 can provide that to me.
22       MR. CONSIDINE:  Right.  I -- yeah, I'm happy
23 to -- to find the time to do that offline.  I -- what I
24 was going to say is my recommendation is, I think this
25 is a valuable discussion for you -- for you to have,

Page 19

1  but I think it is good to kind of start off the way
2  that we said because those are the topics that you
3  asked for and this is a much broader conversation I
4  think we can have at the end.  And I think it's good to
5  have that good open public dialogue on what you're kind
6  of struggling with, what you're kind of figure out how
7  the best way to do that; and it also allows the public
8  to add additional comment onto that.
9       But because from a really technical legal
10 part is, if you all get enough information and with
11 discussions amongst yourselves and you decide that you
12 don't feel that you can legally move forward, because
13 at least you know -- and I get the substantial
14 prejudice part, Commissioner Stearns, but we know they
15 haven't consented.
16       Mr. Tievsky wanted to make -- and he'll say,
17 it, I'm sure again, that they want to engage and they
18 want to be as helpful as possible, but by no way are
19 they waiving that argument, which is why we're having
20 more conversation about it today, but that's the
21 procedural hurdle.  So if that -- if -- if you all feel
22 that they are a necessary party who has a substantial
23 right, then you can't move forward.
24       And getting into all the other stuff, while
25 maybe is important, isn't necessarily the petition --

Page 20

1  part of the petition.  It's something that you can take
2  up at -- on a different path.
3       CHAIR SIZEMORE:  Okay.  Get us back on track.
4       MR. CONSIDINE:  Thank you.
5       And -- and, Senator Conway, I -- I did hear
6  you, and I'm happy to try and provide that information
7  certainly.
8       So I think we've teed it up pretty well.  I
9  don't know if you need to hear from me anymore on
10 necessary party because Commissioner Stearns did a good
11 job of breaking down kind of the -- the three parts.
12 So I'll ask Ms. Henn come up.  I'll stay here in case
13 there's any --
14       CHAIR SIZEMORE:  Sure.
15       MR. CONSIDINE:  -- questions of me, but I'll
16 let Ms. Henn come up and -- and give her part on, I'm
17 guessing when they -- they're going to say that they're
18 not a necessary party just like they did last time.
19       CHAIR SIZEMORE:  Okay.  Welcome.
20       MS. HENN:  Thank you very much.
21       CHAIR SIZEMORE:  And if you could identify
22 yourself for the record when you're ready.
23       MS. HENN:  My name is Emily Henn.  I'm here on
24 behalf of the petitioner, Big Fish Games.
25       Thank you, Mr. Considine, and thank you all

Page 21

1  for allowing us to be here today and address you about
2  our petition for declaratory order.  We're happy to
3  take these issues in the order that Mr. Considine has
4  described.  And as he explained, last month my partner,
5  Ms. Brinkmann, touched on these issues; but our
6  understanding was that the Commission had asked some
7  questions.  We did submit a letter on the necessary
8  party issue, which I'd be happy to address today and
9  answer any questions you may have.
10      The -- the -- this Commission has
11  regulations, and as Commissioner Stearns indicated, the
12  Revised Code of Washington also has a provision under
13  the Administrative Procedures Act that provides that an
14  agency may not enter a declaratory order that would
15  substantially prejudice the rights of a person who
16  would be a necessary party and who does not consent in
17  writing.
18      Whatever -- our position is that whatever
19  interest Ms. Kater may have in the legal arguments that
20  are at issue here about the definition of gambling, she
21  does not qualify as a necessary party within the
22  meaning of the regulations or the -- the code.  And
23  that's because if the ruling that she is -- is urging
24  and the interpretation of necessary party that she is
25  urging would mean that anybody with an interest in the

Page 22

1  meaning of state law could prevent this Commission from
2  carrying out its responsibility that the legislator --
3  the legislature has given it to interpret and enforce
4  the Washington Gambling Act.
5      She of course has an interest in her claims
6  that she is pursuing in federal court, and those claims
7  will be resolved by that court or an arbitrator; but
8  the meaning of state law, she doesn't take the position
9  that that's -- that's a matter that the federal court
10  should decide, because that's -- that's not how our
11  federal system works.  It's for the legislature of this
12  state and this Commission to interpret the laws that
13  are currently in effect.
14      And of course state courts can review those
15  determinations and -- and will to make a final
16  determination of what state law means.  That's not the
17  job of a federal court, which can of course make a
18  judgment about what state law means, but really the --
19  that job is -- is for the state legislature and -- and
20  which has delegated authority to this Commission.
21      The necessary party provision, what -- what
22  that does is protect a third party from having an
23  agency directly adjudicate its rights.  And that's why
24  that -- the -- the language in the -- in the provision
25  is very important.  It -- it refers to rights.  And --

Page 23

1  and what the necessary party provision prevents is a
2  declaratory order proceeding, for example, in a matter
3  where a contract is being interpreted.
4      And -- and we cited a case where there was a
5  Collective Bargaining Agreement.  One party asked an
6  agency to interpret it, and the holding was that the
7  other party, the employer to that contract, was a
8  necessary party.  That's because any determination
9  about that contract, that Collective Bargaining
10  Agreement, would affect the rights of that other party.
11      But here, we're not asking the Commission to
12  enter an order denying relief to Ms. Kater on her
13  claims.  Again, those claims will be resolved by the
14  federal court or the arbitrator.  And the necessary
15  party provision doesn't prevent agency action from
16  occurring merely because a third party is interested in
17  the meaning of state law.
18      That's such a broad standard that it would
19  really mean that any time someone had an interest in
20  the meaning of the state law that this Commission
21  interprets and enforces, they could stop the Commission
22  from entering a declaratory order merely by filing suit
23  in court; and that's -- that's not the rule.  You can't
24  sort of artificially create this situation and -- and
25  assert that your rights are at issue when really what

Page 24

1  your -- your interest in the matter is merely an
2  interpretation of what the law means.
3      And of course Ms. Kater and her -- Ms. Kater
4  is a Michigan resident represented by a Chicago lawyer,
5  who, in that lawsuit, is seeking to represent a
6  nationwide class.  So under -- under the ruling or the
7  necessary party interpretation that Ms. Kater is
8  urging, any of those people could potentially come here
9  and say, no, I understand this is the State Commission
10  that's charged by the legislature with interpreting and
11  enforcing law, but I don't consent to you doing that;
12  and that's just too broad of a reading of that statute.
13      The submission by Ms. Kater talks a lot about
14  the necessary party standard that applies in civil
15  cases, and that's just a very different standard.
16  That's a -- that's a determination that courts make
17  about whether a party can come into a case, and it's a
18  much lower standard.  It's also -- just has different
19  words.  And that's why I'm pleased that -- that the
20  Commission is focusing on the words in the regulation
21  and in the code that -- that apply here, that --
22  that -- that rights of a -- of an individual, a third
23  party, must be substantially prejudiced.
24      We don't think Ms. Kater has rights at issue
25  here more than simply an interest in how this

Page 25

1  Commission interprets state law.  And we don't believe
2  that Ms. Kater's interest would be substantially
3  prejudiced, regardless of how the declaratory order
4  petition is resolved.  She has her case, and the proper
5  place to resolve that case is in -- in federal court or
6  with an arbitrator, and that's -- that's yet to be
7  decided.
8       We also have argued in our letter, and -- and
9  the arguments are there, so I won't spend a lot of time
10  on them here, that we don't think Ms. Kater would even
11  qualify as a necessary party under the civil court
12  standard because really what she's asserting is an
13  interest in a monetary recovery.  And -- and courts, as
14  we've mentioned in the letter, have held that that's
15  not enough.
16       But -- but we don't think that's the key
17  issue.  The key issue here is to apply the regulation
18  and the code provision that only someone with rights
19  that would be substantially affected by the declaratory
20  order is -- is a necessary party under that provision
21  that must consent to this Commission acting on the
22  petition.
23       So I'd be happy to answer any questions or
24  yield to others.
25       COMMISSIONER STEARNS:  A couple questions.

Page 26

1       CHAIR SIZEMORE:  Okay.
2       COMMISSIONER STEARNS:  So maybe -- maybe could
3  you just sort of flip it around just -- just -- just
4  for -- for my sake?  So could you explain what --
5  for -- there are two things, what would make her a
6  necessary party and what would be a right.
7       MS. HENN:  Absolutely.  So what I think the
8  best way to explain what -- what would be a right and
9  what would make her a necessary party is to look at
10  other cases decided by agencies or state courts
11  interpreting that very language.  And I gave one
12  example, which is, if your -- if your specific right is
13  being adjudicated through the declaratory order, for
14  example, that employer's rights in the Collective
15  Bargaining Agreement.  The agency there decided, we
16  can't decide this issue because it would -- it would --
17  it would determine rights of an employer, who is not
18  here and who doesn't consent.  So that's one example.
19       Another example is the Department of Ecology
20  case, I think it was the Boeing Company versus the
21  Department of Ecology.  There the agency held that
22  another agency, which had promulgated a rule, was a
23  necessary party when Boeing came to a separate agency
24  and said, please rule that that other agency's rule
25  doesn't apply to us or should be interpreted in a

Page 27

1  particular way.  So there, the other agency, since its
2  regulation and the interpretation of its regulation was
3  at issue, that agency was determined to be a necessary
4  party, without which the order couldn't proceed.
5       So it has to be a specific right.  And the
6  petition -- and -- and you know, here our petition
7  seeks a ruling as to -- a ruling that -- that Big Fish
8  Games, Big Fish Casino games are not gambling.  That
9  determination would have to determine a right of
10  Ms. Kater.  And while she clearly has an interest in
11  how you interpret state law, because she has a separate
12  case about that, our position is that that's just not
13  enough.
14       And if it were enough, that it would just be
15  way too broad of standard that would really mean that
16  the agency charged with interpreting and enforcing the
17  Washington Gambling Act couldn't ever act.  It would be
18  very easy for a party to say, well, I have a lawsuit
19  over here, so you can't act.  That's our position.
20       COMMISSIONER STEARNS:  So -- so -- so like a
21  contractual right or a property right?  Is that --
22       MS. HENN:  Correct.
23       COMMISSIONER STEARNS:  -- what you're going --
24  okay.
25       MS. HENN:  Exactly.

Page 28

1       CHAIR SIZEMORE:  Okay.  Any other questions?
2  All right, Thank you,
3       MS. HENN:  Thank you very much.
4       CHAIR SIZEMORE:  (Indiscernible).
5       Good morning.
6       MR. TIEVSKY:  Good morning.  I'm Alexander
7  Tievsky.  I represent Cheryl Kater in the lawsuit
8  against Churchill Downs involving Big Fish Games.  I
9  thank the Commission for having me back.  It's great to
10  be here.
11       So what I'd like to do is go through very
12  briefly sort of our -- our affirmative case on
13  necessary party, and then I -- I can address some of
14  the arguments you've heard.  So as -- as you've heard a
15  couple times, if you -- if -- in a declaratory order
16  proceeding, if the Commission is going to adjudicate --
17  if -- if the Commission's order is going to
18  substantially prejudice a necessary party, they require
19  written consent.
20       I know that I am here, but Ms. Kater has not
21  provided the written consent.  So that -- that sort of
22  element is established, and the question is about the
23  other two.
24       So as far as necessary party is concerned,
25  the term necessary party is well established in law.

Page 29

1  And there's no cases and no authority to suggest that
2  it means anything different in the context that it's
3  used in your rules and the statute that regulates this
4  Commission than in any other case.  The Washington
5  Supreme Courts answer this question a couple --
6  numerous times.  It's a pretty low standard.
7         It's a question of, could someone's rights,
8  legal rights be affected.  So they're right, if you're
9  just, you know, if you have a thought about how the law
10 works and you come and you say, I have a thought about
11 this and you, know, it's -- you know, I disagree and I
12 don't consent, that's not enough.  You've got to have
13 something more than that.
14        And in this case, Ms. Kater has a lawsuit.
15 She has got a cause of action that she is given by a
16 Washington statute.  And I haven't heard any
17 explanation about how that's any different from a legal
18 right you get from a contract.  In this case her right
19 doesn't come from a contract, it comes from a law of
20 this state that says she's got a certain right to
21 recover money that she lost at illegal gambling.
22        If you enter the order that they ask for,
23 that makes it more difficult for her to exercise that
24 right.  And that's all you need here.  The Washington
25 Supreme Court has made pretty clear that it is the

Page 30

1  claim that it will affect you that -- that is required.
2  It's not -- the Commission doesn't have to decide for
3  sure that it's going to affect them or that the law
4  means a certain thing in order to determine that
5  someone is a necessary party.
6         As far as the second part, substantial
7  prejudice, I think that's -- that's clearly met here.
8  The -- the reason they're here and asking you for this
9  is because they would like to go back to the court and
10 say, look, look, the Gambling Commission said this
11 wasn't gambling, and therefore, you should listen to
12 them.  The Ninth Circuit got it wrong, they
13 misunderstood the law.  We know now the law is clear,
14 the Gambling Commission has said here fine; and so
15 Ms. Kater needs to lose.
16        I -- I guarantee you that's what they do
17 because they've already tried with the pamphlet that
18 your -- that your staff put together years ago.
19 They -- they told the court, the Gambling Commission
20 has already decided this.  You have to listen to them.
21        If it is done in a formal way, as
22 Ms. Brinkmann talked about last time, that will be a
23 much stronger position for them, and that will -- it is
24 not a sure thing, but it will likely cause Ms. Kater to
25 lose, and that would be substantial prejudice because

Page 31

1  she has spent years litigating this case.  She lost in
2  the district court.  She had to appeal it.  It takes a
3  long time.  It takes a lot of resources.
4         And courts have recognized that when -- when
5  a defendant litigates something in one court, one forum
6  and doesn't like the answer they get and goes somewhere
7  else, that's -- that's prejudicial.  That hurts the
8  person who won because it negates their victory.
9         I'd like to address a comment that was made a
10 couple times in the previous testimony that somehow
11 Ms. Kater or somebody else could come in here and
12 prevent the Commission from acting on this matter.
13 That is not true.  It is simply a procedural question.
14 It is, can you do it this way.
15        And so the declaratory order proceeding,
16 you're deciding based on what Big Fish has submitted,
17 right, their petition, not based on the investigation
18 of your staff.  There's not public notice and comment.
19 The Commission has procedures, formal rulemaking under
20 the Administrative Procedures Act, an interpretive
21 statement, lots of ways you can interpret the law that
22 Ms. Kater has no say in whether or not you do it; but
23 the declaratory order is a special type of proceeding,
24 and it's a little bit streamlined, it doesn't
25 require -- it doesn't have the same procedural

Page 32

1  protections.  You don't have to publish, you know, your
2  proposed rules.  All of those -- all of those
3  protections aren't there.
4         And I -- you know, look, no court has
5  interpreted it and says this, but it appears to me as
6  though that's why this consent requirement is here,
7  that's to make sure that if you're going to do this,
8  it's done in a fair and open way like Commissioner
9  Troyer was suggesting earlier.
10        So you know, we -- Ms. Kater would not come
11 here if you were doing rulemaking or an interpretive
12 statement and say, no, you can't do this.  It -- it is
13 the way that it's being done is that it causes the
14 problem.  Any questions I can answer for the
15 Commission?
16        CHAIR SIZEMORE:  Any questions there?
17        So my -- my question might be to Brian just
18 to affirm what I just heard there.  So what -- what
19 he's saying is that a declaratory order, then the
20 necessary party -- party aspect does apply; but if we,
21 as a Commission, had saw the Ninth Circuit decision and
22 said, oh, we want to do a rule that clarifies that it
23 is gambling or clarifies that it isn't gambling, if we
24 initiated that, then neither Big Fish or Ms. Kater or
25 any other individual would be -- have this necessary

Page 33

1  party or that -- that -- that way of not consenting?

2       MR. CONSIDINE:  That is correct.  Without

3  going through the entire Administrative Procedures Act

4  to see if there's another, but the way that it's been

5  positioned, yes.  I've spent a lot of time in the APA,

6  and clearly AAG Kernutt can correct me if -- if he

7  thinks I am going to misspeak, and I encourage him to

8  do so if I do; but yes, necessary party is very unique

9  to this specific action.  It's not in rulemaking.

10      They can come and give comment, and you've

11 gone through a rulemaking, but they -- they couldn't

12 come in and say, this is going to really harm us and

13 you can't do the rulemaking or you can't do an

14 interpretive statement or you can't do some other

15 action that you're, you know, you're able to do.

16      CHAIR SIZEMORE:  Okay.

17      AAG KERNUTT:  You -- you accurately summarized

18 the issue, so I have no corrections.

19      COMMISSIONER STEARNS:  (Indiscernible) and --

20 and in terms of the -- I -- I don't think we've covered

21 what -- what's happened in other states, and I -- one

22 of the letters referenced actions in Maryland,

23 California, Illinois, and Michigan.  Can you fill us in

24 on that?

25      MR. TIEVSKY:  Yeah.  I -- so I -- I litigated

Page 34

1  the Maryland case --

2       COMMISSIONER STEARNS:  Okay.

3       MR. TIEVSKY:  -- and one of the Illinois

4  cases, so like I can speak to that a little bit.  Those

5  states have very different laws than Washington does.

6  So --

7       COMMISSIONER STEARNS:  Was -- was it on behalf

8  of the same client?

9       MR. TIEVSKY:  No.  They're -- they're

10 different, different clients, different games, many of

11 them, that work in different ways; but most importantly

12 the statutes are really different.  So Washington

13 statute says that people can recover if they lose money

14 or thing of value.  In Maryland, you have to lose

15 money, period.  There's not a thing of value there.

16 And so the courts said, well, you didn't lose money.

17 You maybe lost this thing of value, but that doesn't

18 matter.

19      But in Washington that's not the law.  And --

20 and the Ninth Circuit -- the Ninth Circuit made this

21 same comment, those are -- those are very different

22 laws.

23      In Illinois, there's a requirement that you

24 can only sue the winner of a gambling game.  And the

25 courts have said, well, these people aren't running --

Page 35

1  these games aren't winners because they don't put

2  anything at risk.  I don't know how true that is,

3  but -- but in Washington the law allows you to recover

4  from a winner or a proprietor.  Those are, you know,

5  proprietor is a much broader -- broader comment, so it

6  doesn't -- it doesn't really apply.  So you know,

7  these -- these -- these gambling laws are real old, and

8  states develop them in -- in different ways.

9       And I would say that Washington regulates

10 gambling more tightly than a lot of states do.  You

11 know, the work -- the work that you do here and the --

12 the -- the, you know, degree of oversight that this --

13 that this Commission has is -- is -- is far more than

14 you see certainly in places like Nevada, but even in

15 places like -- like Illinois or Maryland.  And so -- so

16 that's why you see different results in different

17 states.

18      Hawaii is a really interesting example.

19 Hawaii's law is almost exactly the same as

20 Washington's, except that it lacks the thing of value

21 definition, at the very end lacks the -- the phrase,

22 you know, play at a game without charge.  And there is

23 actually a lot of discussion in Hawaii House of

24 Representatives about that issue and about potentially

25 changing that.  I hope that helps.

Page 36

1       COMMISSIONER STEARNS:  Yeah, thank you.

2       MR. CONSIDINE:  I -- I just note, we have

3  not -- I have not -- I don't believe staff has spent a

4  lot of time look -- yet looking at those cases, just

5  based on the posture of this.  I would guess that these

6  other cases are all civil cases between

7  non-governmental entities, right?  So it's

8  manufacturers, proprietors, and -- and customers or

9  citizens.

10      So those cases are all going to be very

11 different, the way in which they're set up is going to

12 be different, because, much like Mr. Tievsky just

13 talked about, they're coming under -- well, they're not

14 consumer protection laws; they were laws that were put

15 into place to try and provide a remedy for someone who

16 felt that they were being taken advantage of by someone

17 doing an illegal activity.  Whereas this clearly is

18 going before the regulatory body of the Gambling Act

19 and asking for you all to interpret something related

20 to their games.

21      And it can be taking other places, the facts

22 may be the same; but the procedural posture, how it

23 gets before you, how you look at it, and what happens

24 from here is going to be a little bit different than

25 those states.  So while those cases very well could be

Page 37

1  informative and I'm sure happy, whether it's staff or
2  asking the parties to kind of provide some summary of
3  that or counsel, we can do that; but I don't -- I --
4  I'm sure it's helpful, but I don't know if it's going
5  to provide a great answer.
6        CHAIR SIZEMORE:  Okay, perfect.
7        COMMISSIONER STEARNS:  Oh.
8        CHAIR SIZEMORE:  So --
9        MR. CONSIDINE:  Sorry.
10       COMMISSIONER STEARNS:  I didn't have one.
11       CHAIR SIZEMORE:  You're good, okay.
12       MR. CONSIDINE:  I was just going to say,
13  because we talked about these other states, I was going
14  to recommend that we invite, at least, Ms. Henn, on
15  behalf of Big Fish, if she wants some comments
16  specifically on what have other states done with this
17  since we've given Mr. Tievsky the ability to talk about
18  that.  Short, brief, just gives them both -- you hear
19  from --
20       CHAIR SIZEMORE:  Sure.
21       MR. CONSIDINE:  -- both.  Yeah, okay.
22       CHAIR SIZEMORE:  Absolutely.
23       MR. CONSIDINE:  And then she can stay up for
24  the next part.
25       CHAIR SIZEMORE:  Okay.  And I'm going to

Page 38

1  actually give us about a five-minute recess.
2        MR. CONSIDINE:  Fair enough, but --
3        CHAIR SIZEMORE:  But --
4        MR. CONSIDINE:  But for the record purposes,
5  if we can kind --
6        COMMISSIONER STEARNS:  Yep.
7        MR. CONSIDINE:  -- finish the state part --
8        CHAIR SIZEMORE:  Yes.
9        MR. CONSIDINE:  -- and then break.
10       COMMISSIONER STEARNS:  Yeah, yeah.
11       MR. CONSIDINE:  Okay, awesome.  Thank you.
12       MS. HENN:  I'll make this brief, and I
13  appreciate the opportunity to comment.  I think these
14  other state cases probably get into the next issue
15  we're going to talk about, thing of value and -- and
16  how other states have interpreted gambling.  I will
17  recommend to you the ESA letter, which ESA is kind of
18  uniquely positioned, having members as they do, who
19  operate all over the country, and they have followed
20  these cases very closely.
21       While these other states were interpreting
22  different laws, and of course they're -- that's --
23  that's critical when you're interpreting a statute to
24  pay attention to the language, I think it's -- it's
25  worthwhile to note that many of those cases, it was

Page 39

1  Mr. Tievsky's firm representing different clients, but
2  really out suing -- bringing cases that are an attempt
3  to expand the definition of gambling under all these
4  different state laws.
5        And as you heard, he's very familiar with
6  them because he's been through that process.  And as
7  far as I'm aware, all of the states rejected these
8  attempts to expand gambling to encompass the types of
9  games that we are here today to talk to you about, Big
10  Fish Casino, where there's no possibility of getting
11  money back.  You know, once you buy a virtual item,
12  your money is spent regardless of the outcome of any
13  games that you play.
14       But I think that discussion is probably
15  better held for the thing of value discussion.  It --
16  but it is -- I think that ESA letter is very helpful to
17  walk you through just exactly what those courts held
18  and why they determined under those laws that these
19  types of games are not gambling.
20       CHAIR SIZEMORE:  Okay, all right.
21       Any clarification?  Okay.  Just to close this
22  out, I did want to offer -- or ask if there are any
23  other parties in the public or in -- in the audience
24  that wish to add something to the record regarding
25  necessary party.  So is there anyone?  Not seeing

Page 40

1  anyone.
2        If we can, I'd like to do just like a
3  five-minute recess, and then we'll come back and take
4  it up right where we are.
5        MS. HENN:  Thank you very much.
6        CHAIR SIZEMORE:  Okay, thanks.
7        (Off the record)
8        (On the record)
9        CHAIR SIZEMORE:  All right.  I will call us
10  back from recess, and we will return to the petition
11  for declaratory order as proposed by Big Fish Games.
12       And, Brian, I'll put you back in command.
13       MR. CONSIDINE:  Thank you, Mr. Chair.
14       The next topic will be related to thing of
15  value, which is really the -- the substantive part
16  of -- of this.  To try and help frame it, clearly our
17  gambling laws, we're very good at summarizing it
18  shortly as you have to have prize consideration and a
19  game of chance.  I think to simplify it as this, based
20  off of what a -- is in the record and -- and there is
21  not a lot other than conversations with questions as to
22  what are the games that are being played, I think
23  everyone can agree they're casino-style games, so I
24  think they're at least games of chance under our --
25  just under Washington State law.

Page 41

1         And so that thing of value, which is -- has
2    its own definition -- so this gets into the -- the
3    legal weeds, but unfortunately that's a little
4    unavoidable here, that thing of value a chance --
5    always attaches to that consideration, which is what do
6    you pay, what do you give for a gambling activity when
7    we're talking about gambling and then the prize, what
8    do you receive, it all centers around thing of value,
9    which is where the Ninth Circuit opined on and really
10   where really the crux of what you'll hear from
11   Ms. Henn, Mr. Tievsky, and anybody else will be related
12   to, is there a thing of value that they're either
13   giving or that they're receiving as a prize and under
14   our definition whether it -- it -- it meets that.
15        So that's why thing of value, one, why I'm --
16   I believe you came back and you wanted to know that
17   because that's what it centers around.  And -- and
18   that's really what the Ninth Circuit -- that's what the
19   civil case centers around, that's what the petition
20   centers around.  And I will let Ms. Henn summarize kind
21   of how they feel it fits or doesn't fit within their
22   operational model, but I just wanted to -- to talk
23   about -- set that up real quick.
24        CHAIR SIZEMORE:  Okay.  Any questions for
25   Brian before Ms. Henn?

Page 42

1         COMMISSIONER TROYER:  I have some questions.
2         CHAIR SIZEMORE:  Yes.
3         COMMISSIONER TROYER:  Is thing of -- there we
4    are, get away from it.  Is thing of value -- is thing
5    of value defined in law or defined through court
6    decisions?
7         MR. CONSIDINE:  Thing of value is defined in
8    our Gambling Act.
9         COMMISSIONER TROYER:  Okay.  But is the court
10   interpretation of that thing of value, what --
11   what's -- is this part of the discussion here?
12   Sometimes I know law -- law --
13        MR. CONSIDINE:  Right.
14        COMMISSIONER TROYER:  You have a law in the
15   books and then you have administrative decisions that
16   are made around that law.  And I guess to me I'd like
17   to know a little bit more of that history, because it's
18   not the first time this Commission has had the thing of
19   value before.  And so I guess that would be a request
20   for information on it.
21        MR. CONSIDINE:  Certainly.  And -- and I think
22   this may be helpful is the Ninth Circuit issued a
23   decision interpreting our statute related to the civil
24   claims that Ms. Kater was bringing.  You are
25   determining it based off of your regulatory authority,

Page 43

1    based off the information that you're -- you're
2    receiving.  And it may just be best if I read the
3    statute into the record, that way maybe that -- that's
4    a little helpful.
5         Thing of value, as used in this chapter,
6    which is the Gambling Act, means any money or property;
7    any token, object, or article exchangeable for money or
8    property; or any form of credit or promise directly or
9    indirectly contemplating transfer of money or property
10   or of any interest therein or involving extension of a
11   service, entertainment, or a privilege of playing at a
12   game or scheme without charge.
13        And it was -- I -- I think, without --
14   without remembering directly and looking at the
15   citation, that while it says 1987, I think that's the
16   original definition from 1974 or 1973.  I think they --
17   they reorganized the -- they reorganized the statute in
18   '87, so I don't believe it really has changed since it
19   was first created.  And written the only way the
20   legislature could do in the '80s, in a long paragraph
21   like that.
22        You know, I know it can be a little bit hard
23   to follow, and that's why we -- we have Ms. Henn and
24   Mr. Tievsky to kind of let you know kind of their
25   thoughts on that; but this is the definition.  The

Page 44

1    definition I just read is -- is what we're talking
2    about when it relates to if what you're paying is a
3    thing of value.
4         And I think more on this end, based on
5    conversations that I've heard several representatives
6    from these companies talk about, it's that part, you
7    know, there's no prize.  Their argument is, and she can
8    talk about it, there's no prize.
9         And so even if there is consideration, there
10   may or may not be, because you can play these games for
11   free, but you can also spend money to upgrade the
12   product, there is no prize.  And that's what -- that's
13   been the argument that we've heard, and that where
14   thing of value comes in.  And it -- it has come in
15   on other conversations this we've had over the last
16   year related to other types of activities and whether
17   or not a virtual object, the way in which it's being
18   used, is there a marketplace, those sorts of things, is
19   there a thing of value.
20        And you've been struggling.  You know, we've
21   been really discussing this and getting into it in
22   great depth for the last year or so.
23        CHAIR SIZEMORE:  Mrs. Patterson.
24        VICE CHAIR PATTERSON:  There is no prize, but
25   the definition also includes the words or in involving

Page 45

1  extension of entertainment?
2       MR. CONSIDINE:  Right.
3       VICE CHAIR PATTERSON:  So it's more than
4  just -- the -- the definition includes more than a
5  prize.
6       MR. CONSIDINE:  Right.  And -- and it's more
7  than just getting money back.
8       VICE CHAIR PATTERSON:  Right.  And the
9  definition --
10      MR. CONSIDINE:  I mean, we've talked --
11      VICE CHAIR PATTERSON:  -- includes the
12  extension of service, entertainment, or the privilege
13  of playing the game --
14      MR. CONSIDINE:  Right.
15      VICE CHAIR PATTERSON:  -- without charge.
16      MR. CONSIDINE:  Right.  And -- and that's
17  where the Ninth Circuit seized -- of what I remember,
18  the Ninth Circuit seized on that a little bit, too,
19  that there was an extension of play, and therefore the
20  games were gambling.  And --
21      VICE CHAIR PATTERSON:  Okay.
22      MR. CONSIDINE:  And that's where the Ninth
23  Circuit came.
24      VICE CHAIR PATTERSON:  All right.
25      MR. CONSIDINE:  And -- and I'm sure the

Page 46

1  attorneys will correct me if I've miss -- if I've
2  misremembered the case.
3       COMMISSIONER STEARNS:  Right.  And -- and I
4  mean, but what you just read, I think, what it also
5  comes down to, the last part is without charge.
6       MR. CONSIDINE:  Uh-huh.
7       COMMISSIONER STEARNS:  And that -- that seems
8  to be key, if there's an actual charge.
9       MR. CONSIDINE:  Right.  And I think that's a
10  very good question and a good segue to give it over to
11  Ms. Henn and kind of talk about that from Big Fish's
12  perspective.
13      MS. HENN:  Thank you very much and thank you
14  again.  May it please the Commission, I'd be happy to
15  address thing of value, because I do think that's kind
16  of where we're -- we're all focused.  You know, just a
17  note, I think you're all familiar, the petition that we
18  filed is seeking a declaratory order on a -- on a
19  narrow issue, and it's essentially under existing law,
20  which we'll get into on thing of value, whether Big
21  Fish Casino games constitute gambling.
22      So some of the procedures that Mr. Tievsky
23  was talking about, making new rules, or potentially the
24  legislature making new law, you know, that may happen;
25  but what we're here today to talk about is existing law

Page 47

1  and -- and whether this game is gambling.  Our position
2  is that Big Fish Casino games virtual tokens are not
3  things of value because they can't be sold, they can't
4  be redeemed, and they can't be cashed out for money or
5  for a prize.  And furthermore, they're prohibited --
6  prohibited by the game's terms of use from being
7  transferred for commercial game -- gain, excuse me, and
8  have no real world value.
9       VICE CHAIR PATTERSON:  Well, can I ask a
10  question?
11      MS. HENN:  Please.
12      CHAIR SIZEMORE:  Yes, you may.
13      VICE CHAIR PATTERSON:  So you just gave me
14  your opinion of what a thing of value is, but we have
15  the words in black and white right here and what it is
16  that the State of Washington defines as a thing of
17  value.
18      MS. HENN:  Absolutely.  And --
19      VICE CHAIR PATTERSON:  So you're -- you're
20  expressing your opinion that it is not a thing of value
21  because of your definition of thing of value.  What
22  about as it relates to the State of Washington's
23  definition?
24      MS. HENN:  Yes.  And that's -- and our
25  argument is very much tied to the statute, so I'd be

Page 48

1  happy to jump right in there.
2       VICE CHAIR PATTERSON:  I apologize if I jumped
3  the gun.
4       MS. HENN:  Not at all.  I want to make sure I
5  address the questions that are important to you.  So
6  under RCW 94.06.237, that -- that statute defines
7  gambling as requiring the opportunity to win something
8  of value.  RCW 94.06.285 does -- defines thing of
9  value, and that's the statute you were looking at.
10  And -- and it -- it --
11      VICE CHAIR PATTERSON:  Right.
12      MS. HENN:  It can be broken down into four
13  possible things that could be a thing of value, money
14  or property, a token or object or article exchangeable
15  for money or property, a form of credit that
16  contemplates transfer of money or property, and then
17  the fourth one, which is where your question,
18  Commissioner Patterson, is focused and where the Ninth
19  Circuit was focused is any form of credit or promise,
20  directly or indirectly -- and I'm skipping a few words
21  to get to the relevant part -- involving extension of a
22  service, entertainment, or a privilege of playing at a
23  game or scheme without charge.
24      And we believe that under many established
25  principles of how statutes are interpreted that our --

Page 49
1 I don't think there's any dispute that our games,
2 tokens don't fall in those first three categories.  The
3 dispute is whether it falls under the fourth.  And we
4 think you have to read that fourth and the language
5 without charge to recognize that if a game, as our game
6 is -- is free to play, that -- that it -- that a token
7 that would extend play that's already free is not --
8 does not qualify under that definition of -- as a thing
9 of value.
10         That's essentially the argument we make.  We
11 think it's very key that the statute, when it talks
12 about extension of a privilege of playing without
13 charge.  Big Fish Casino games are free to play.  The
14 vast majority -- pardon me -- of people who play never
15 spend money at all.  We've detailed in a declaration
16 that was submitted with our petition, free tokens are
17 awarded to players every day when they sign on to the
18 game, as well as every 30 minutes during gameplay.
19 That's in the Vella declaration.
20         And the problem with the logic of Ms. Kater
21 and her attorneys is that -- and -- and the ESA letter
22 talks about this, too, if in a free game, a token that
23 extends gameplay is considered a thing of value, even
24 playing with chips or tokens that the user acquired for
25 free would be gambling.

Page 50
1         And it's just inconceivable that the Gambling
2 Act was intended to find gambling where a player risks
3 no money and has no chance to make a profit.  And if
4 this game -- if this result were adopted, again the ESA
5 letter points out, it would sweep a vast number of
6 games into the definition of gambling that -- that, you
7 know, we would submit were never intended to be there.
8         Essentially, what our declaratory order
9 petition is seeking is a confirmation, a reaffirmation
10 that what the Commission guidance brochure from 2014
11 said is right.  And that's what everyone in this
12 industry, everyone who works in this industry and plays
13 these games has been relying on for many years now.
14 And Mr. Considine referenced this, what that brochure
15 describes is that there are basically three elements
16 when you break them down to gambling: prize,
17 consideration, and chance.
18         And whereas a game that's free to play, but
19 that offers these in-game tokens that may involve
20 consideration and may involve chance, it does not offer
21 any prize; and so it falls outside the definition.  And
22 that's -- was very clearly stated in the -- in the
23 brochure back in 2014.  And regardless of whether that
24 was a formal act by the Commission of -- of passing --
25 of -- of -- of publishing that brochure and providing

Page 51
1 that guidance, that has been the rule that everyone has
2 been -- has understood and has relied on for all these
3 years.
4         So that's really kind of the narrow focus of
5 our petition.  Of course Ms. Kater is seeking her claim
6 in the federal lawsuit is under a different statute,
7 the Recovery of Money Lost at Gambling Act; and so you
8 know, she's portraying that as a right that's at issue
9 here.  Really what's at issue here is whether that
10 guidance is accurate that everyone has relied on,
11 whether that prize element is required, and whether
12 extending a game that's already free to play would
13 constitute -- could constitute a thing of value under
14 the statute.
15         VICE CHAIR PATTERSON:  Please.
16         MS. HENN:  Please.
17         VICE CHAIR PATTERSON:  It's free to play,
18 free -- monetarily free, but it's not -- but when you
19 extend it without charge, you are providing
20 entertainment.
21         MS. HENN:  Absolutely.  We think that --
22 again, the game is free to play.  Most people never
23 spend any money in the game, a vast, vast majority.
24 And -- and we do believe our games provide
25 entertainment value, that that's -- that's the value

Page 52
1 that people get out of them.  When people choose to
2 purchase in-game tokens, that's what they're getting in
3 exchange.  If they buy tokens, that money is spent.
4 There's no expectation or -- that that money ever would
5 possibly come back to that person.
6         So then when they take those tokens and play
7 games with them, it's not -- they're not playing with a
8 thing of value, because there's no possibility that any
9 money could come back in the form of a prize or
10 otherwise.  Those tokens have no real world -- world
11 value.
12         CHAIR SIZEMORE:  Okay.
13         COMMISSIONER TROYER:  Can -- can you -- I
14 think this would be helpful, Julia.
15         VICE CHAIR PATTERSON:  Help me.
16         COMMISSIONER TROYER:  And can you explain why
17 the legislature would write, without charge, what that
18 means?
19         MS. HENN:  Yes.  We think the statute is very
20 purposefully written in that way with those four
21 different categories, each of which references money or
22 property.  And in that fourth category, that without
23 charge brings it back to that same idea that in order
24 to be gambling, you have to not only have consideration
25 and chance, but you have to have a prize, something of

Page 53

1  value, something of real world value.
2         And -- and so when you read the statute and
3  you read all those elements or -- or categories of
4  thing of value in conjunction, you read them together,
5  you should read them consistently with each other and
6  the -- the language without charge is -- is critical,
7  because it's a different thing if you're extending
8  gameplay without charge when you normally would charge
9  someone ten dollars, that's -- that's value you're
10  getting.
11        But when you're extending gameplay that's
12  always free, that's something differently entirely.
13  And again, the prize element is missing.  And that's
14  been the understanding of the industry, again, and
15  hundreds of thousands maybe a million people who play
16  these games in the state.
17        We also, in our -- in our -- in our petition
18  and in our letter that we submitted after last month's
19  hearing, we've talked about some other statutory, some
20  other Washington law about how to interpret statutes.
21  We've talked about the idea that if they're -- things
22  are in a group, that they should be interpreted
23  consistently.  There's also a principle that if there
24  is a general term, it should be interpreted
25  consistently with specific -- specifically identified

Page 54

1  items.  And again here, you've got money or property
2  referenced repeatedly and the idea of things having a
3  real world value.
4         And -- and we also think it's very important,
5  and this is recognized under Washington law, that you
6  interpret a statute consistent with its purpose.  And
7  the Washington Gambling Act's express purpose was to
8  keep the criminal element out of gambling without
9  restricting participation by individuals in activities
10  and social pastimes which are more for amusement rather
11  than profit.
12        And these games, like many others, are
13  unmistakably social pastimes that are played for
14  entertainment.  They can never be played for profit
15  or -- or real world value.  So that idea of a criminal
16  element, it -- it's just not something that's even an
17  issue with these games.
18        Another principle of interpreting Washington
19  law is that it must be interpreted in accordance with
20  the Rule of Lenity, and that's because the Gambling
21  Act, as you all well know, imposes criminal penalties
22  in certain circumstances.  And the Rule of Lenity
23  requires that if there are any ambiguities in -- in --
24  in construing a statute, they should be construed in a
25  manner that limits rather than expands criminal

Page 55

1  liability.
2         And this again gets back to sort of the
3  limited purpose of this petition, which is just to ask
4  this Commission to settle this uncertainty and clarify
5  the existing law as written and as explained in the
6  brochure and in place for many years does not
7  include -- include this type of virtual token that can
8  never be redeemed for anything of real world value,
9  does not include it as a thing of value that would
10  create -- that would fall within the gambling statute.
11        CHAIR SIZEMORE:  So we've gone a little bit
12  long and really haven't really paid --
13        MS. HENN:  I apologize.
14        CHAIR SIZEMORE:  -- much attention to the
15  clock, but I think I'll, you know, kind of let you know
16  you probably have about three minutes left after -- not
17  including Commissioner Troyer's question.  So you can
18  either use that now or after Mr. Tievsky.  So that will
19  be your option.
20        MS. HENN:  All right, thank you very much.
21        CHAIR SIZEMORE:  Thank you.
22        COMMISSIONER TROYER:  (Indiscernible).
23        MS. HENN:  Please.
24        COMMISSIONER TROYER:  Well, there's a call for
25  amusement, and you said there's very few people that

Page 56

1  actually buy the chips compared to how many people
2  play?
3         MS. HENN:  That's correct.
4         COMMISSIONER TROYER:  The ones that are buying
5  the chips, why would somebody buy chips?  I get from
6  you, 19, 20 bucks a month or whatever, why are we
7  bringing letters and stories and stuff I look at online
8  of people playing thousands and thousands of dollars a
9  day playing free -- free -- I mean, it's probably not
10  very amusing for them if there's somebody that's got a
11  problem and ends up paying thousands of dollars.  Why
12  don't you have caps on that?
13        Why isn't there a 29.95 monthly subscription,
14  you never run out if it doesn't -- I mean, basically it
15  kind of sounds to me that you've created a way to
16  gambling without ever winning for sure.  So you know
17  going in that you're not going to win no matter how
18  much money you pump into it.  I mean, who does that?
19  Obviously people that have issues.
20        And it seems kind of predatory to me.
21  Without being -- being a weird analogy, because I -- I
22  worked in law enforcement, what happens when a crack
23  dealer gives somebody free -- free pieces of crack.
24  Here -- here is your first week's for free, and then
25  they come back and buy it.  I mean, I -- I mean, really

Page 57

1  I mean, then they come back and buy it.  Well, if you
2  want more, then it's going to cost ya.
3       Because you're looking at a small percentage
4  of the people that are buying the money.  I mean, who
5  in their right mind would pay chips for free unless
6  they've got an issue.  I -- I mean, that's why I'm
7  having a hard time explaining if anybody actually sits
8  down and plays this for fun for hundreds and hundreds
9  of dollars a month and are actually having fun and
10 aren't just stressed about money, aren't hooked on
11 gambling, or something is wrong; because anybody with
12 anybody common sense, you know.
13       My five-year-old granddaughter won't go stick
14 a quarter in a machine unless it gets out a ticket and
15 she gets a stuffed animal.  She's just not going to put
16 the money in there and watch the thing go around.  So I
17 mean, it's just that I -- I don't -- that's really
18 where I'm locked up at.
19       MS. HENN:  Yeah.  And what --
20       COMMISSIONER TROYER:  The evil on the back end
21 of this thing.
22       MS. HENN:  Well, I very much appreciate that
23 questions and the comments, because as I said, I -- I
24 want to be sure and get right to the heart of what
25 you're concerned about and thinking about.  And I know

Page 58

1  that the types of issues you're talking about are of --
2  of great concern to this Commission and -- and laudably
3  so.
4       A couple of responses.  I think first it's
5  not true to say, and I know Ms. Kater's comments say
6  this, that it's not free to play.  And -- and the
7  evidence in the record is -- is uncontroverted.  As
8  Mr. Vella explains, you do get free chips every single
9  day that you log on and every 30 minutes.  So it is
10 possible to play for free.  It's not -- it's not the
11 case that you have to buy tokens.
12       So then -- then your other question, then why
13 would people do it; and I think the answer is, you
14 know, this is a common model for games, and the reason
15 people pay money to get additional tokens or other
16 in-game virtual items is the entertainment value.  And
17 that's not to take away from your -- your concern,
18 which is not about somebody spending two dollars, but
19 somebody spending more; but that -- that's the value
20 they get.
21       And you're absolutely right that once they
22 spend the money, that money is gone.  It's not --
23 that's why it falls outside of the longstanding
24 understanding of gambling, which is when you put
25 something at risk.  You -- you pay consideration, you

Page 59

1  play a game of chance, and something is at risk that
2  you could get back or you could lose.  Here, once
3  that -- once you buy those tokens, everyone knows that
4  money is gone.  You're not -- so when you go on to use
5  those tokens, you're seeking the entertainment value,
6  not to get any money back.
7       And that's why this is really different under
8  existing law.  And whether some new kind of law might
9  come into place if -- you know, addressing concerns
10 like yours is not really at issue in this petition.  It
11 may be for the legislature.  It may be, you know, for
12 other bodies to -- to make those sorts of decisions;
13 but what -- what we're looking at is just under
14 existing law.  And again, as it's been interpreted and
15 explained for -- since long -- for many, many years,
16 whether these --
17       COMMISSIONER TROYER:  Well, technology --
18       MS. HENN:  -- this model --
19       COMMISSIONER TROYER:  Technology has changed
20 for many, many years and the laws don't, you know?  And
21 a lot of the stuff and the technology and things that
22 are out there didn't exist and they weren't even part
23 of what the rules were written for.
24       MS. HENN:  I think -- I think --
25       COMMISSIONER TROYER:  You do it on your phone,

Page 60

1  and a lot of those laws were written for that.
2       MS. HENN:  That's undoubtedly true that a lot
3  has changed about our world.  And it was interesting to
4  hear the discussion of bingo and pull tabs this
5  morning, because lots of things are changing.  And
6  absolutely, laws -- new laws get passed to address
7  different things.  And may well that could happen, but,
8  you know, this game, the Big Fish Casino games were
9  around, for example, when this brochure was published.
10      And -- and I -- as I understand it, there was
11 a, you know, discussion and a demonstration of how it
12 worked.  And -- and you know, the -- the guidance that
13 was put out and has been in place since 2014 was that
14 buying virtual prizes, if a player spends real money
15 for a virtual prize and these items cannot be sold or
16 redeemed for real value or a prize, it's not gambling.
17 And that's kind of what everyone has understood.
18      Now, the law could change, but again we're
19 here just asking for this narrow petition to be
20 decided, which is, does this game fall outside of the
21 definition of gambling.  And I'd be happy to reserve my
22 time or answer questions.
23      CHAIR SIZEMORE:  Okay, all right.
24      COMMISSIONER STEARNS:  I -- I just wanted to
25 just quickly follow up.  And what I was --

Page 61

1    MS. HENN:  Please.
2    COMMISSIONER STEARNS:  -- saying is that, I
3    mean, there -- there is definitely -- you know, we're
4    moving to a confluence where between video gaming,
5    which I think is almost an archaic term now and -- and
6    gambling, there are a lot of activities out there that
7    do have or that -- that pose risks for a certain sector
8    of our population that will suffer from gambling
9    disorder on the gaming side and gaming disorder on --
10   on the video side.
11       And there's -- there's some excellent work.
12   Like -- like Camadare (phonetic) does great work with
13   young people who are addicted to video gaming.  And
14   definitely that's something I -- I think, you know, the
15   legislature could take a look at, you know, as things
16   become more and more used on a mobile or consoles or --
17   or even PCs, just to see where -- you know, how we can
18   help people who are, you know, suffer from a disorder.
19   So I just wanted to put that as something for us to
20   think about.  And it's --
21       CHAIR SIZEMORE:  Did you have a question?
22       COMMISSIONER STEARNS:  No.
23       CHAIR SIZEMORE:  Okay.
24       COMMISSIONER STEARNS:  It's -- it's more of a
25   comment.

Page 62

1    CHAIR SIZEMORE:  All right.
2    COMMISSIONER STEARNS:  Thank you.
3    CHAIR SIZEMORE:  Do you want to
4    (indiscernible) or do you --
5    MS. HENN:  I -- I'd like to reserve my time.
6    I'm happy to answer any other questions.
7    CHAIR SIZEMORE:  Okay.
8    MS. HENN:  But I appreciate everyone's time.
9    CHAIR SIZEMORE:  Okay.
10   MS. HENN:  Thank you.
11       CHAIR SIZEMORE:  Well, I -- we're not keeping
12   super close time, but we certainly would extend similar
13   time to Mr. Tievsky, although there might be bonus
14   points if you don't use all your time, I don't know.
15       MS. HENN:  Thank you very much.
16       CHAIR SIZEMORE:  That's not true.  You're --
17   you have the right to the same amount of time.
18       MR. TIEVSKY:  I appreciate that.
19       MR. CONSIDINE:  She was on the record about
20   ten minutes.
21       MR. TIEVSKY:  Thank you.
22       MR. CONSIDINE:  Just to let you know.
23       MR. TIEVSKY:  Thank you.
24       MR. CONSIDINE:  (Indiscernible) worry about
25   it.

Page 63

1    MR. TIEVSKY:  That's helpful.
2        So I think that -- that Commissioner
3    Patterson, when -- when we started out this -- this
4    discussion, I -- I think you identified the exact flaw
5    in -- in Big Fish's argument here, which is that
6    they're basing it and -- and the phrase, common
7    understanding of gambling was said over and over and
8    over again, and that just means what they think
9    gambling is.
10       We have -- in Washington, there is -- there
11   is a law that defines what thing of value is, and they
12   cannot explain why this isn't, why their chips aren't
13   something that allows you to play a game or a scheme
14   without charge.  Their only response to that is, our
15   game is free.
16       It isn't free.  It isn't free.  And the way
17   you know that is because there are -- they used to be
18   owned by Churchill Downs, which is a public American
19   company.  Public companies have to put out investor
20   reports.  They're public.  The federal government puts
21   them out on the website.
22       And here's what they say about how they're
23   going to take money:  Our business depends on
24   developing and publishing free to play and premium paid
25   casual and mobile games that consumers will download

Page 64

1    and spend time and money on consistently.  You -- I --
2    I don't understand how you can possibly spend money on
3    a game that is always free.
4        And the language changed there somewhat.  At
5    the beginning she said, you can always play it for
6    free.  And then in response to Commissioner Troyer's
7    question, it is possible to play it for free.
8        Here's how it actually works, they give you
9    some free chips.  They give you a bunch when you start,
10   and they do, they give you a limited amount on -- at
11   certain intervals.  You run through those real fast.
12   They get you through, depending on what games you play,
13   they get you through 15 minutes.  It's not very long.
14   And then it pops up with a screen and it says, continue
15   the fun, 9.99, and that gets you a little bit more.
16       Now, when they notice that you start spending
17   a lot of money, like -- like Ms. Kelly, who submitted a
18   letter, they start reaching out to you and they say,
19   hey, you're in our VIP tiers, you know, what can we do
20   to help you out?  They start sending personal notes.
21       And they start telling you things like, you
22   know, well, we can give you some more free chips, but
23   the amount of free chips we can give you depends on how
24   much you've spent recently, recent spend is what they
25   call it, until you get to the point where you're like

Page 65

1  Ms. Kelly, you've spent more than $300,000 on the game
2  and you -- you start asking your personal VIP
3  representative, hey, can I have some more chips; and
4  they say things like, well, I'm not really allowed to
5  give you any more free ones right now because we have
6  to base how many free chips we can give you on certain
7  factors, like recent spend, but just this one time I'll
8  give you a few.
9        And this is in response to Ms. Kelly saying
10  things like, I just went through $400 worth of chips in
11  an hour, a thousand dollars worth of chips in an hour.
12  So to say that this game is -- is free is just a --
13  it's just a gross -- a gross misstatement. I don't --
14  I don't think there's anything more real world than
15  cashing out your husband's retirement account and --
16  and running up huge HELOC loans just to -- to play this
17  game. That's -- that's -- that's real world.
18        So yes, they give away some free play. So
19  does Seven Cedars, so does Alinie (phonetic), so does
20  probably every casino in this state. To get you in the
21  door, they -- that's -- and look, when -- when you're
22  regulated, when the Commission approves these things,
23  that's fine; but this is totally unregulated. They
24  operate not under your oversight in any possible way.
25        I'd like to discuss a little bit, a common

Page 66

1  understanding of gambling. So there's a case from a
2  few years ago that the Commission was involved in
3  called Bullseye, Bullseye involved a machine that you
4  got to play for free every day. Everyone got a free
5  play, but then if you wanted to play more after that,
6  then you had to put in money.
7        And the Commission argued to the court, hey,
8  it doesn't matter that you can play for free every day,
9  it's still gambling, and the Court of Appeals agreed
10  with the Commission. And that's what the Ninth Circuit
11  relied upon when it said, you know, it doesn't matter
12  that -- that you can't cash out. It doesn't matter
13  that they give you free chips sometimes. That's --
14  that's not relevant.
15        The point is, they have value because people
16  have to buy them to keep playing the game. They extend
17  the privilege of playing the game for free.
18        VICE CHAIR PATTERSON: But continuing to play
19  for some is more valuable than actually winning money.
20        MR. TIEVSKY: That's correct. And that's --
21  that's what Professor Schull explains in her book
22  and -- and in the -- in the letter she kindly submitted
23  that -- that yes, for -- for people who are --
24  particularly people who are addicted to machine
25  gambling, that what they're looking for is to in

Page 67

1  what -- what's called -- they -- they call it the
2  machine zone. It's sort of this dissociative state
3  where -- that -- that people get addicted to, that
4  they're -- that they're just sucked into the game.
5        And -- and that's what you see with problem
6  slot machine gamblers. And you see exactly the same
7  thing here. And Professor Schull explains that this
8  is -- this is exactly, exactly the same thing.
9        Let's see, with respect to -- oh, I'm
10  sorry.
11        VICE CHAIR PATTERSON: So I guess I'm --
12  I'm -- yeah. You were making the point that there is a
13  difference between gambling addiction and gaming
14  addiction. With a gaming addiction, there's never a
15  point where the game will come and say, for 99 cents --
16        MR. TIEVSKY: (Indiscernible) out. I mean,
17  there are -- there are plenty of console games and PC
18  games, you know, over Washington. You can spend lots
19  of money.
20        VICE CHAIR PATTERSON: Uh-huh.
21        MR. TIEVSKY: But it -- I mean, it -- it's
22  like -- but the -- the question is, is that gambling or
23  is that not, so --
24        VICE CHAIR PATTERSON: Okay.
25        MR. TIEVSKY: -- but the same addictive

Page 68

1  qualities are there. I mean (indiscernible) but that
2  also applies to definitely things that are not
3  gambling, as well as these (indiscernible).
4        COMMISSIONER STEARNS: I -- I think -- oh,
5  can -- I'll let -- I'll let Commissioner Troyer go
6  ahead.
7        CHAIR SIZEMORE: Yeah, real quick,
8  Commissioner Troyer.
9        COMMISSIONER TROYER: Just because I want to
10  ask you guys, did you set something that you could
11  spend up to $400 in an hour, $250 or $400 an hour? Is
12  that -- is that actually possible? If you're the worst
13  poker player or the worst slot player, well, can you
14  actually put $400 into this and make it disappear in an
15  hour?
16        CHAIR SIZEMORE: Well, she'll come back if you
17  want to ask her that.
18        COMMISSIONER TROYER: Okay, all right. I
19  just -- he -- he said that, I just wanted to --
20        CHAIR SIZEMORE: Yeah.
21        COMMISSIONER TROYER: -- make sure. I -- I
22  don't -- you know, that's -- that's a pretty big
23  statement.
24        CHAIR SIZEMORE: Right.
25        COMMISSIONER TROYER: I just wanted to make

Page 69

1 sure that that's actually a real thing.
2     MR. TIEVSKY: Yeah, it's -- it's a real thing,
3 maybe -- maybe even more than that. There's no limits
4 on -- on how much -- on how much folks can spend. It
5 is -- it is an awful lot of money. As far as the --
6 the video game question, I think part -- part of the
7 reason that this is gambling as opposed to some of the
8 video games and other things we're talking about is
9 that you have to -- well, first of all, it's -- it's
10 completely a game of chance, which is part of the
11 gambling rules in -- in the state. There's no -- these
12 are slot machines. There's nothing the players can do
13 to affect the outcome. That's part of it.
14     The other part of it is you have to pay to
15 continue. So it's not a matter of paying to, you
16 know -- to enhance your gameplay, to get a -- to get a
17 better soccer player or to -- to, you know, to get
18 something that looks cool, right? It's either you pay
19 or you stop. And -- and that's the really
20 psychologically powerful part that Professor Schull
21 talks about in her research.
22     MR. CONSIDINE: You've got two minutes.
23     MR. TIEVSKY: Thank you.
24     So I -- in my end of my time, I'd like to
25 address the -- the pamphlet that the Commission put out

Page 70

1 a few years ago. So when I say the Commission put it
2 out, it is a -- it is a two-page like a tri-fold
3 pamphlet that Director Trujillo and his staff put
4 together several years ago. There's -- there's no
5 indication -- I asked for records about this, there's
6 no indication that any commissioner ever saw it, that
7 there was ever a vote on it. You know, it's -- it's
8 something that staff put together to -- to have in the
9 lobby basically, based on -- based on their
10 understanding.
11     But the -- the staff does great work here.
12 Every -- every staff member I've interacted with has
13 been outstanding, but it's the Commission that sets the
14 policy here. And I -- I don't think -- I think it
15 would be a mistake for the Commission to feel hamstrung
16 by something that -- that staff put together based
17 on -- based on their understanding.
18     And if you look at documents from around that
19 time in 2013, this was brought, Big Fish, in fact, in
20 particular was brought to the Commission; and the chair
21 of the Commission at that time, Mr. Velez had
22 questioned, said, well, wait a minute, this kind of
23 sounds like gambling to me.
24     So -- so the idea that this has been some
25 sort of -- that -- that we're just confirming what the

Page 71

1 Commission has always said is -- is not accurate.
2 The -- the Commission has never come to a -- to a
3 consensus that, well, obviously Big Fish Games isn't
4 gambling, you know, that is -- that is very, very much,
5 and as Commissioner Troyer mentioned earlier an -- an
6 open question.
7     And let's see, I will -- I will -- I will end
8 with this, if this game is free, I do not understand
9 how the company is worth almost a billion dollars and
10 how they've made a hundred -- one year publicly
11 reported profits on just the casino portion of the
12 game, $180 million. I -- I don't understand how you
13 can do that with a game that -- that, as -- that, as
14 their counsel said, is always free. Those things don't
15 add up.
16     I'm happy to answer any other questions.
17     CHAIR SIZEMORE: Thank you.
18     MR. TIEVSKY: Thank you.
19     MS. HENN: You've all been very patient and
20 generous with your time, so I'll keep this brief, but I
21 do appreciate just a few minutes --
22     CHAIR SIZEMORE: Uh-huh.
23     MS. HENN: -- to address, to respond a little
24 bit. I think what you've just heard and what you see
25 in the comments that have been submitted, several of

Page 72

1 them, is an argument about expanding or changing
2 existing law and perhaps regulating things that are not
3 currently regulated under Washington's Gambling Act.
4 What you didn't hear was an argument about why the
5 staff's brochure that was in place starting in 2014 is
6 wrong based on the three traditional requirements for
7 something to be gambling; the -- the consideration,
8 chance, and -- and prize.
9     And -- and that's really the key reason, we
10 think, under existing law it's pretty clear that our
11 games don't -- don't fall within that statute, and that
12 is what this petition, the narrow question this
13 petition is raising is whether Big Fish Casino games
14 are gambling under existing law, not what future law
15 might look like or how, if one were going to regulate
16 these games, how one might do it.
17     Just to respond to the points that
18 Mr. Tievsky made about how this game could possibly be
19 free, it's -- it's -- the facts are very plain that
20 free tokens are given every day, given every
21 30 minutes; that the vast majority, I think it's over
22 90 percent, and we could submit evidence on that if
23 you'd prefer it in a sworn declaration, of people never
24 pay money. So it's just not correct for Mr. Tievsky to
25 claim otherwise.

1      These games are free to play and most people
2  play them that way.  Others choose to -- to -- to buy
3  virtual coins for their entertainment value, to extend
4  game time, to allow them to make bigger, you know,
5  different kinds of bets in games.  And again, the --
6  the -- the -- thing that's key about this is once
7  people purchase those tokens, their money is spent,
8  then they go and play the game.  And if they -- if --
9  if they consume chips, it's they're doing that as part
10  of the entertainment of the game.  There's never any
11  real world value to those -- to those coins.
12      Arguments about revenues that Big Fish Games
13  takes in just aren't -- I -- I -- I would submit that
14  they're sort of to divert attention from the -- the
15  narrow legal issue here, because that -- that's not at
16  all relevant under the statute to whether this is
17  gambling.  We've talked through the elements, and I
18  appreciated the focus on -- on the statutory language,
19  which is extending game time without charge.
20      When this game is free to play, we submit
21  that it just doesn't fall under the statute, that it's
22  been clear for many years, and many have relied on that
23  interpretation in playing and making these games.
24      VICE CHAIR PATTERSON:  So that profit that the
25  company is making is substantial, and you just said

1  that that profit is being provided by ten percent of
2  the people who play.
3      MS. HENN:  I don't have the exact percentage
4  here, but it's -- it's definitely true, and I -- and as
5  I said, we can submit evidence about it if -- if the
6  Commission wants more information, that over 90 percent
7  never spend money.
8      VICE CHAIR PATTERSON:  Okay.  So the ten
9  percent then are spending a heck of a lot of money.  I
10  mean --
11      CHAIR SIZEMORE:  Or is it --
12      VICE CHAIR PATTERSON:  -- the ten percent
13  might have a problem.
14      CHAIR SIZEMORE:  Is there --
15      VICE CHAIR PATTERSON:  I mean, they're --
16      CHAIR SIZEMORE:  -- ad revenue?
17      VICE CHAIR PATTERSON:  Pardon me?
18      CHAIR SIZEMORE:  I said -- I'm just curious if
19  there's ad revenue.
20      VICE CHAIR PATTERSON:  Is there -- I mean, is
21  that -- what -- where else do you get revenue from?
22      MS. HENN:  I -- I don't want to misstate
23  anything because I didn't study up on this --
24      CHAIR SIZEMORE:  Okay.
25      MS. HENN:  -- and ask my client.  So I --

1      VICE CHAIR PATTERSON:  Okay.
2      MS. HENN:  If the Commission would like to
3  know that, I can definitely find out more, but -- but
4  again --
5      VICE CHAIR PATTERSON:  Well, I guess my point
6  of my --
7      MS. HENN:  Please.
8      VICE CHAIR PATTERSON:  -- question is that if
9  ten percent of your players are generating an enormous
10  amount of money, that sounded like an enormous amount
11  of money to me, I would think that that ten percent
12  is -- is spending an enormous amount of money, maybe
13  that ten percent has a problem.  Maybe they're getting
14  something of value that would result in them providing
15  enormous profits, enormous profits to that company.
16  That's just what I'm thinking right now.
17      MS. HENN:  No, and I -- I appreciate that, and
18  I -- and I think Commissioner Troyer made comments that
19  were similar about focus on that concern.  I do think,
20  you know, this is a quite common model of fremium games
21  where there are in-app purchases available and
22  Electronic Software Association makes that argument as
23  well in its -- in its submission.
24      But again getting to the statute and how
25  gambling is defined under Washington State law, I would

1  submit that those issues that are -- that -- that I
2  know the Commission is very concerned about with
3  responsible play and -- is really about, if this were
4  gambling or if the law changed so that it was
5  regulated, how you might do that.
6      Whereas under existing law, it's pretty clear
7  that that third element of the prize is missing here
8  because nothing of real world value is -- is at stake
9  when people play these games.  Nothing -- the tokens
10  can never be converted into cash or money or anything
11  of real world value.  And that's really what the --
12  what the brochure described and explained.
13      And again, you know, there are many, many
14  games that kind of do this same model where it's free
15  for -- free or you can choose to buy things.  And the
16  value you get from those purchases is the entertainment
17  value, not a thing of value as defined under the law to
18  require -- as -- as required under the law to make it
19  gambling.
20      CHAIR SIZEMORE:  All right.  I think your time
21  is just about expired, but --
22      MS. HENN:  Right.
23      CHAIR SIZEMORE:  -- Commissioner Troyer has a
24  question.
25      COMMISSIONER TROYER:  I just wanted to come

Page 77

1  back to the same thing I asked you before, can you
2  spend $250, $400 an hour playing.
3       MS. HENN:  I'm not aware that -- that
4  there's -- I think that that may well be true.  I don't
5  think there's a limit that I'm aware of in terms of
6  what you can play or what -- what, you know, how many
7  tokens you --
8       COMMISSIONER TROYER:  I mean, is it
9  possible --
10      MS. HENN:  -- can put --
11      COMMISSIONER TROYER:  -- that the machine in
12  the program will let you spend that much money in an
13  hour playing, yes or no?
14      MS. HENN:  I -- I would want -- before I
15  answer like a factual question like that, I think I
16  would want to --
17      COMMISSIONER TROYER:  Okay.
18      MS. HENN:  -- double check with my client, but
19  again, I think -- and -- and I'd be happy to do that
20  if -- if the Commission would like.
21      CHAIR SIZEMORE:  Okay.
22      MS. HENN:  But I think the key part, again, is
23  while there is consideration and while there is a game
24  of chance here, there is no money ever coming out.
25  There is nothing of value.  These things can't be

Page 78

1  converted to a thing of value.
2       COMMISSIONER TROYER:  So --
3       MS. HENN:  So prize or a thing of value.
4       COMMISSIONER TROYER:  -- I'd like to actually
5  know that.  And -- and so putting it into perspective,
6  if you had an elderly parent that was spending $500 a
7  day doing this, what would you do about it?  Just think
8  about that.  I want to know that question.  Is there
9  protections for somebody that gets -- like casinos can
10  tell people are gambling a lot of money and they can
11  sell -- they can ban people, they can recognize problem
12  gambling.
13      Do you have a mechanism in place where
14  someone is spending $500 a day spending free cards to
15  stop that?  I'd like to know that, if -- if -- if
16  that's a possibility.  And then also, it's starting to
17  sound like your argument is boiling down to
18  technicality that's in a piece of paperwork or -- or an
19  old law or somewhere in a brochure and not what's
20  really happening.  And so we're -- I guess we're going
21  to have to take a look --
22      CHAIR SIZEMORE:  Yeah.
23      COMMISSIONER TROYER:  -- a look at that, but I
24  mean, you know --
25      CHAIR SIZEMORE:  Okay.

Page 79

1       COMMISSIONER TROYER:  -- where I'm coming from
2  on the whole thing.  It seems like every time we talk
3  and the more I get to know about this, the worse it
4  sounds.  That's just to be honest with you.
5       MS. HENN:  I --
6       CHAIR SIZEMORE:  All right.
7       MS. HENN:  I think just in response, you know,
8  the entire industry relies on knowing what the law is
9  and -- and -- and being able to read the law and
10  understand it.  And this Commission plays an important
11  role in interpreting --
12      COMMISSIONER TROYER:  Right, but you guys --
13      MS. HENN:  -- the law.
14      COMMISSIONER TROYER:  -- that were the one who
15  came and brought this up to us.
16      MS. HENN:  Because of the uncertainty.
17      COMMISSIONER TROYER:  Right.
18      MS. HENN:  That's correct.  And we're just
19  asking the Commission to interpret the law that's on
20  the books.
21      CHAIR SIZEMORE:  All right.  So thank you.
22      SENATOR CONWAY:  I have one.
23      CHAIR SIZEMORE:  Senator Conway.
24      SENATOR CONWAY:  From -- from the legislative
25  side here, how many -- how many Washingtonians play Big

Page 80

1  Fish?
2       VICE CHAIR PATTERSON:  (Indiscernible).
3       CHAIR SIZEMORE:  Oh, hold on a second.
4  Senator Conway.
5       MS. HENN:  That is in the Vella declaration,
6  and I believe it's upwards of 700,000 who have
7  downloaded the game that's geo-located -- with a
8  geo-location in Washington State.  Let me double check
9  that so I'm sure that I gave you the right -- the right
10  number.  More than 865,000 installations of this game
11  have come from an IP address geo-located in the State
12  of Washington.
13      SENATOR CONWAY:  And am I right in assuming
14  that ten percent of those people are paying for chips?
15      MS. HENN:  I don't know that number.  I --
16  what I came here knowing was that over 90 percent play
17  for free, but if you want the precise number of --
18      SENATOR CONWAY:  I -- I do.
19      MS. HENN:  -- people who pay, I can find --
20      SENATOR CONWAY:  I'm a --
21      MS. HENN:  -- out.
22      SENATOR CONWAY:  -- legislator here.  You
23  know, I think that --
24      MS. HENN:  Yes.
25      SENATOR CONWAY:  -- that we'd like some facts,

Page 81

1  okay?  Thank you.
2        MS. HENN:  Yes, absolutely.  We'd be happy to
3  submit that.
4        CHAIR SIZEMORE:  Commissioner Patterson, you
5  had another?
6        VICE CHAIR PATTERSON:  I don't know.
7        CHAIR SIZEMORE:  Okay.
8        VICE CHAIR PATTERSON:  I -- I'm just really
9  struck by the fact that ten percent of the players are
10 making that much money for your company.  I mean, what
11 is it about --
12       CHAIR SIZEMORE:  Well --
13       VICE CHAIR PATTERSON:  -- that -- that ten
14 percent?  Why -- why would they spend all that money?
15 Why -- why isn't the money coming equally from a
16 hundred percent of your players?
17       MS. HENN:  It's --
18       VICE CHAIR PATTERSON:  So it --
19       CHAIR SIZEMORE:  Well --
20       VICE CHAIR PATTERSON:  That's all.
21       CHAIR SIZEMORE:  Okay.
22       VICE CHAIR PATTERSON:  Yeah.
23       CHAIR SIZEMORE:  All right.
24       MR. CONSIDINE:  And -- and I think those are
25 information that they're clearly willing to try and

Page 82

1  give you and --
2        CHAIR SIZEMORE:  Right.
3        MR. CONSIDINE:  -- that might be best
4  formulated when you go into closed session if you want
5  more information, how to -- how to do that.
6        CHAIR SIZEMORE:  Right.
7        MR. CONSIDINE:  I would just say, Mr. Chair,
8  to give anyone else that's here today a chance to
9  comment or see if anyone wants to comment before we --
10 we break for the --
11       CHAIR SIZEMORE:  Yeah.
12       MR. CONSIDINE:  -- a closed session since
13 we're running up into the noon hour.
14       CHAIR SIZEMORE:  Yep.  So -- so thank you.
15       MS. HENN:  Thank you very much.
16       VICE CHAIR PATTERSON:  Thank you.
17       CHAIR SIZEMORE:  So I am offering the
18 opportunity for any other interested party in this
19 petition for declaratory order in regards to the thing
20 of value component of this -- of this matter, if there
21 is anyone else that would like to come add something to
22 the record.  It does not appear that there is.
23       So I would propose, maybe we've got two
24 commissioners already that decided to go to closed
25 session early.

Page 83

1        MR. CONSIDINE:  I -- I would --
2        CHAIR SIZEMORE:  Not a quorum, mind you.
3        MR. CONSIDINE:  Right.
4        CHAIR SIZEMORE:  Just two.  The -- we have a
5  space?
6        MR. CONSIDINE:  We do.
7        CHAIR SIZEMORE:  Okay.  So --
8        MR. CONSIDINE:  I -- I would just see -- just
9  so that we can close this down before you go, is there
10 anybody from the public that wants to provide any more
11 comments on Big Fish petition in general?  That way, if
12 there was anything else --
13       CHAIR SIZEMORE:  Okay.
14       MR. CONSIDINE:  -- now is the time.
15       CHAIR SIZEMORE:  Okay.  I will extend that
16 offer, if you didn't hear.  If there's anyone from
17 the -- from the audience that would like to add
18 something to the record on this Big Fish petition.  It
19 doesn't appear that we have anyone.  So we are going to
20 go into closed session, estimated 15 to 20 minutes, and
21 then we'll return and let you know what we are going to
22 do next.
23    (Off the record)
24    (On the record)
25       CHAIR SIZEMORE:  All right.  We are back in

Page 84

1  open session.  And on the matter of Big Fish Games
2  petition for declaratory order, we will be setting this
3  matter over until our October commission meeting for
4  further consideration and decision.  The comments
5  submitted so far require serious thought and serious
6  consideration and deal with complex issues of statutory
7  interpretation.  For these reasons, good cause exists
8  to extend the statutory limits set forth in RCW
9  34.05.240.
10       So the Commission has signed an order of --
11 to that effect, and we will -- we will not be having
12 any further oral arguments on the matter.  Any
13 additional information that would like to -- that
14 people would like to include in the record would need
15 to be submitted to Brian Considine by September 30th.
16 And -- and then we will announce some sort of decision
17 in October.
18       So --
19       VICE CHAIR PATTERSON:  (Indiscernible).
20       CHAIR SIZEMORE:  Is the closing of additional
21 information.
22       So, Brian.
23       MR. CONSIDINE:  Would you like to give a time
24 on that, like 5:00 p.m. Pacific Time?
25       CHAIR SIZEMORE:  Sure, 5:00 p.m. Pacific

Page 85

1  Time --
2        MR. CONSIDINE:  Thank you.
3        CHAIR SIZEMORE:  -- on September 30th to be
4  included in the record.  So with that, it completes our
5  work on the petition for declaratory order for this
6  meeting.  And so our next -- next act is, we will be
7  going into executive session to discuss pending
8  investigations.
9                  - - -
10      (Whereupon, the proceedings were concluded)
11                  - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1  STATE OF WASHINGTON)
               ) SS:
2  COUNTY OF WHATCOM  )
3
4
5        I, CHRISTINE AIELLO, do hereby certify
6  that I transcribed the audio, and that the foregoing is
7  a true and complete transcription of the audio
8  transcribed under my personal direction.
9        IN WITNESS WHEREOF, I do hereunto set my
10  hand at Blaine, Washington, this 27th day of August,
11  2018.
12
13
14
15
16      _____
17        Christine Aiello
18
19
20
21
22
23
24
25