UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SEAN WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PLAYTIKA, LTD., an Israeli limited company, PLAYTIKA HOLDING CORP., a Delaware corporation, and CEASARS INTERACTIVE ENTERTAINMENT, LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO. 3:18-cv-05277-RBL<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND STRIKE AND GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE<br><br>DKT. #40 & 43 |

## INTRODUCTION

THIS MATTER is before the Court on Defendants Playtika, Ltd., Playtika Holding Corp., and Ceasars Interactive Entertainment, LLC.'s (collectively "Playtika") Motion to Dismiss and Strike. Dkt. #40. The underlying dispute is a class action to recover money lost playing electronic gambling games available through different platforms, including Facebook and mobile. Playtika argues that the Complaint should be dismissed for lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim. Playtika also argues in the

1 alternative that allegations related to Vegas Downtown Slots should be stricken from the

2 Complaint because Wilson has not alleged that he actually played that game.

3 **BACKGROUND**

4 Playtika Ltd. is an Israeli company that markets a number of apps that allow players to

5 partake in popular gambling games, such as slot machine, via Facebook and mobile. Complaint,

6 Dkt. #1, at 2, 6. Playtika's apps include Slotomania, House of Fun, Caesars Slots, and Vegas

7 Downtown Slots, the first three of which Wilson has personally played. *Id*. at 6, 10. All of these

8 apps allow users to play gambling games with virtual "coins" that may be purchased in the apps

9 after users run out of the initial free allotment. *Id*. at 7-8. Despite the fact that these coins cannot

10 be redeemed for actual money, Wilson alleges that they are nonetheless valuable because they

11 can be used to continue playing. *Id*. at 7-8, 14. Therefore, Wilson alleges that Playtika's apps

12 constitute gambling as defined by RCW § 9.46.0285 in violation of RCW § 4.24.070. Wilson

13 also alleges two derivative claims for violation of the Washington Consumer Protection Act,

14 RCW § 19.86.010, and unjust enrichment. *Id*. at 15-18.

15 **DISCUSSION**

16 **I.      Personal Jurisdiction**

17 *a.      Legal Standard*

18 When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the

19 plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v.*

20 *Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004). A plaintiff cannot simply rest on the

21 bare allegations of its complaint, but rather is obligated to come forward with facts, by affidavit

22 or otherwise, supporting personal jurisdiction. *Amba Marketing Systems, Inc. v. Jobar*

23 *International, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977). Where the motion is based on written

24

materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Schwarzenegger*, 374 F.3d at 800. A prima facie showing means that the plaintiff has produced admissible evidence, which if believed, is sufficient to establish the existence of personal jurisdiction. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir. 1995). Conflicts in affidavits must be resolved in the plaintiff's favor. *Id.*

*b.* *Application*

Playtika contends that Wilson lacks personal jurisdiction to sue in Washington both because Playtika is not headquartered or incorporated in the state and because it merely placed its app in the stream of commerce and did not direct its activities at Washington. Wilson concedes that general jurisdiction is lacking, but argues that specific jurisdiction is satisfied because Playtika entered into numerous contracts with consumers in Washington who had downloaded their app. Essentially, the parties quarrel over whether the "purposeful direction" or "purposeful availment" test for jurisdiction applies.

A court's personal jurisdiction analysis begins with the "long-arm" statute of the state in which the court sits. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir. 2002). Washington's long-arm statute extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits, so the jurisdictional analysis under state law and federal due process are the same. *Byron Nelson Co. v. Orchard Management Corp.,* 95 Wn.App. 462, 465 (1999); *Schwarzenegger*, 374 F.3d at 800–01.

Personal jurisdiction exists in two forms, general and specific. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002). For specific jurisdiction, the Ninth Circuit applies a three-prong test. *Schwarzenegger*, 374 F.3d at 802. First, "[t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident

thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Id.* Second, "the claim must be one which arises out of or relates to the defendant's forum-related activities." *Id.* Finally, "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id.*

For the first prong, the "purposeful direction" analysis is most often applied in tort cases and "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id.* at 803. In contrast, the "purposeful availment" analysis is most often used in suits sounding in contract, and often requires "evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id.* at 802. When deciding whether to apply the purposeful availment or direction analysis, courts look to the underlying dispute to determine whether it primarily sounds in contract or tort. For example, in *Boschetto v. Hansing*, the plaintiff's claims included breach of contract, misrepresentation, fraud, and violation of a consumer protection law against the seller, but the court applied the purposeful availment analysis because all of the claims were premised on the contract. 539 F.3d at 1016; *see also Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C 12-06458 SI, 2013 WL 1996318, at *4 (N.D. Cal. May 13, 2013) (holding that "[t]he alleged torts of intentional and negligent interference with prospective economic advantage arise out of the parties' contract").

In *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, the Ninth Circuit applied the purposeful direction analysis in a copyright infringement suit where the plaintiff alleged that the defendant unlawfully posted its photos on its website. 647 F.3d 1218, 1221-22, 1229 (9th Cir. 2011). The court held that there was jurisdiction, and explained that "a website with national

viewership and scope [that] appeals to, and profits from, an audience in a particular state . . . can be said to have 'expressly aimed' at that state." *Id.* at 1231; *see also Boschetto*, 539 F.3d at 1018 (describing a "sliding scale analysis that looks to how interactive an Internet website is for purposes of determining its jurisdictional effect").

While the purposeful direction analysis tends to focus on the website itself, purposeful availment applies in cases mainly related to specific transactions carried out online through a website or other platform. *Boschetto*, 539 F.3d at 1018. The Supreme Court has described the analysis as a "practical and pragmatic" review of the contractual relationship, including the overall business negotiations and future objectives of the parties. *See id.* at 1016 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). In *Boschetto*, the court found that there was no purposeful availment where the parties consummated one lone transaction for a car via eBay. *Id.* at 1017. However, the court also stated that a party's use of eBay to establish "regular business with a remote forum" may be sufficient for purposeful availment. *Id.* at 1019. Indeed, other courts have held that a seller's use of an online platform to run a "sophisticated business" and conduct a "substantial volume of sales" constitutes purposeful availment. *See, e.g., Oakley, Inc. v. Donofrio*, No. SACV1202191CJCRNBX, 2013 WL 12126017, at *5 (C.D. Cal. June 14, 2013); *Sennheiser Elec. Corp. v. Chutkowski*, No. CV1107886SJOFMOX, 2012 WL 13012471, at *4 (C.D. Cal. Apr. 20, 2012). Courts have also found purposeful availment where the defendant sells inventory and provides follow-up services from its own site. *See Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp.*, 253 F. Supp. 3d 1115, 1129 (D. Or. 2017).

This case presents a difficult middle ground between the discrete categories of contract and tort. On the one hand, Wilson's claims sounds in contract since he is essentially trying to recover for numerous transactions that he now argues were illegal. On the other hand, Wilson's

claims also rest on the design of Playtika's app as a whole, since he can only succeed if this novel form of online gaming constitutes "gambling" under Washington law. In this way, Wilson's suit resembles a product liability action in which Playtika allegedly designed a dangerous product that allows people to gamble online.

However, while the design of Playtika's apps may be integral to determining whether the transactions Wilson entered into were illegal, the transactions themselves are at the heart of this case. In other words, Playtika's apps can only be illegal insofar as they facilitate illegal gambling, which is transactional or contractual in nature. As Wilson explains, the common law treats parties to a wagering contract as in *pari delicto*, leading courts to traditionally refuse to rescind such contracts. 7 Williston on Contracts § 13:23 (4th ed. 2018). To counter this, states have passed laws like RCW § 4.24.070 to provide a means of restoring parties to their original positions. *See* 38 Am. Jur. 2d *Gambling* § 161; *see also, e.g., In re Armstrong*, 217 B.R. 569, 579 (Bankr. E.D. Ark. 1998) (refusing to apply Arkansas's gambling statute to an "out-of-state regulated contract" for a wager); *Berkebile v. Outen*, 311 S.C. 50, 53, 426 S.E.2d 760, 762 (1993) (debating whether the Carolina gambling law allows for recovery from legal as well as illegal gambling contracts). Playtika disputes whether gambling is transactional vs. contractual, but both of these terms refer to the type of business relationship that calls for the purposeful availment analysis. *See* Reply, Dkt. #64, at 2-3; *Burger King*, 471 U.S. at 479 (stating that courts should focus on the overall business *transaction*). In any case, Playtika fails to explain how the core of Wilson's claims is better characterized as falling under tort law. Thus, because the alleged violation of § 4.24.070 is the basis of all of Wilson's claims, the purposeful availment analysis is applicable.

Under that framework, Playtika has purposefully availed itself of the privilege of doing business in Washington. Unlike cases involving lone or limited transactions, the record shows that Playtika has used its apps to sell many coins to many users located in Washington. *See* Opp'n, Dkt #57-2, Ex. 2, at 5-10. In addition, similar to *Helicopter Transport Services*, Playtika's sales to its users are part of ongoing relationships. 253 F.Supp.3d at 1129. To turn a profit, Playtika's games rely on at least some users repeatedly running out of coins and then buying more in order to continue playing. Playtika thus "contemplate[s] future consequences" when it sells coins to its users, satisfying the purposeful availment analysis. *Burger King*, 471 U.S. at 479.

Even if the purposeful direction analysis were applied, Playtika would still be subject to personal jurisdiction.[1] Like the defendants' website in *Mavrix Photo*, which attracted a nationwide audience but turned a profit on third-party ads targeting California, Playtika's apps are available nationwide but benefit Playtika when Washington residents make purchases on the app. *Mavrix Photo*, 647 F.3d at 1230. Thus, even though Playtika may not specifically target Washington residents, it can be charged with actual or constructive knowledge of its user base because it is aware that individuals with Washington IP addresses have purchased virtual coins. *See* Opp'n, Dkt #57-2, Ex. 2, at 5-10; *Mavrix Photo*, 647 F.3d at 1230 (charging the defendant with constructive knowledge of its California user base because of the targeted nature of the

---

[1] While the Ninth Circuit has held that it applies different analyses for tort and contract claims, the Court is not aware of any case mandating the application of one approach or the other in hybrid cases such as this. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995). Many courts have chosen to nonetheless apply just one analysis when confronted with plaintiffs alleging both tort and contract claims. *See, e.g., Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C 12-06458 SI, 2013 WL 1996318, at *4 (N.D. Cal. May 13, 2013); *TRC Tire Sales, LLC v. Extreme Tire & Serv., Inc.*, No. CV-08-015-FVS, 2008 WL 3200727, at *3 (E.D. Wash. Aug. 6, 2008); *Goldberg v. Cameron*, 482 F. Supp. 2d 1136, 1144 (N.D. Cal. 2007). However, as one district court observed, a court may also apply both standards "in order to avoid any doubt about the propriety of jurisdiction." *Oakley, Inc. v. Donofrio*, No. SACV1202191CJCRNBX, 2013 WL 12126017, at *4 (C.D. Cal. June 14, 2013).

third-party ads on its site). Indeed, this case is analogous to *Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.Com*, where the court held that a gambling website with just five Virginia members "interacts with Virginia consumers to such degree as to put JPR on notice that it is purposefully directing its activities at Virginia and its residents." 128 F. Supp. 2d 340, 350 (E.D. Va. 2001); *see also 3M Co. v. Christian Investments LLC*, No. 1:11CV0627 TSE/JFA, 2012 WL 6561732, at *6 (E.D. Va. July 12, 2012) (relying on *Alitalia-Linee*). Playtika has more users in Washington than JPR did in Virginia, and consequently purposefully directs its activities at the forum.

Playtika does not argue the remaining prongs of the personal jurisdiction analysis, which are satisfied here. The second prong is easily met, since Wilson's claims arise out of his purchase and use of coins from apps Playtika makes available in Washington State. *See Schwarzenegger*, 374 F.3d at 802. Finally, the third prong is also satisfied because exercising jurisdiction over Playtika is reasonable and fair. *See id*. Playtika makes its apps available in Washington and profits substantially from business in the forum. As the Ninth Circuit has observed, it would be unfair to "allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Mavrix Photo*, 647 F.3d at 1231 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985)). Wilson therefore has specific jurisdiction to sue Playtika in Washington.

## II.     Forum Selection Clause

Playtika argues that the Court must enforce the forum selection clause found in its Terms of Service, which identifies Israel as the proper forum for all disputes. However, to enforce this provision, Wilson must have agreed to be bound by Playtika's Terms of Service. Wilson argues

that he never manifested such agreement because he never had notice of the Terms, which take the form of "browsewrap."

Unlike clickwrap agreements, which require a consumer to affirmatively click a box manifesting their assent to a website's terms, browsewrap agreements may sometimes be formed simply by using a website containing a hyperlink to its terms. The Ninth Circuit has stated that "the validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d at 1176 (quoting *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill.2011)). "Courts have consistently enforced browsewrap agreements where the user had actual notice of the agreement." *Id.* However, where this is not the case, whether a website would put a reasonably prudent user on inquiry notice of its terms "depends on the design and content of the website and the agreement's webpage." *Id.* at 1177. Courts should distinguish between cases where the terms of use are "buried at the bottom of the page or tucked away in obscure corners of the website" and cases "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Id.* Ultimately, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement." *Id.*

In *Nguyen*, the Ninth Circuit held that a browsewrap agreement was not formed despite the fact that the hyperlinks to the website's terms of use were either visible without scrolling or located so close to the "checkout" button that a user would necessarily see them. *Id.* at 1178. The court distinguished *PDC Labs., Inc. v. Hach Co.*, where the website's hyperlinks were similarly conspicuous but users were also prompted to "review terms" before placing their final order. *Id.*

(quoting No. 09–1110, 2009 WL 2605270 (C.D.Ill. Aug. 25, 2009)). The court held that websites with conspicuous hyperlinks but that "provide[] no notice to users nor prompt[] them to take any affirmative action to demonstrate assent" do not give inquiry notice. *Id*. at 1179; *see also McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017) (finding no inquiry notice where the website's notification stated that "completing your purchase" would bind the user to the terms, but did not state that clicking the "start now" button to begin a free trial would carry this consequence).

In contrast, in *Meyer v. Uber Technologies, Inc.*, the Second Circuit held that a browsewrap agreement was formed where the notification and hyperlink regarding terms of use were "spatially . . . [and] temporally coupled" with the mechanism for manifesting assent. 868 F.3d 66, 78 (2d Cir. 2017). As the court described, "The Payment Screen [was] uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account . . . , and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'" *Id*. The court held that a reasonable consumer would understand that this configuration "connect[ed] the contractual terms to the services to which they appl[ied]." *Id*.

Courts have also recognized that the labels of "clickwrap" and "browsewrap" do not encompass every type of online consumer contract. The defining features that makes clickwrap agreements regularly valid are the forced confrontation with the terms and the forced decision to accept or reject them by clicking a button. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 838 (S.D.N.Y. 2012) (citing *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377 (S.D.N.Y. 2010)). However, even if a website or app contains just a hyperlink to the terms, courts have been more willing to find a valid agreement if the user is still forced to somehow manifest their assent to the terms, as opposed to passively browsing the site. *See, e.g., Nicosia v.*

*Amazon.com, Inc.*, 834 F.3d 220, 236 (2d Cir. 2016) (recognizing that there is a "hybrid between a clickwrap and browsewrap agreement"); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017); *Cullinane v. Uber Techs., Inc.*, No. CV 14–14750–DPW, 2016 WL 3751652, at *8 (D. Mass. July 11, 2016). The key questions in such situations is whether the website or app adequately informs a reasonable user that by clicking a certain button they are also agreeing to be bound by the terms. *Nicosia*, 834 F.3d at 236.

Here, there is no such notification. Instead, when the user clicks to play Playtika's games on Facebook, they are presented with a screen with information about data sharing practices with Facebook and a large, blue "Continue" button. At the very bottom of the screen, in grey text, is a link that says "App Terms." This does not inform the user that clicking the "Continue" button doubles as a manifestation of their assent to Playtika's Terms. In addition, the link's distance from the "Continue" button and its lack of an accompanying notification makes this insufficient inquiry notice to form a browsewrap agreement under *Nguyen*. 763 F.3d at 1179. As for the mobile apps, Playtika identifies no point before downloading that a user could access the Terms of Service even if they hunted for them.

The "Terms of Service" link at the bottom of the gameplay screen within the Facebook apps also does not put a user on inquiry notice. The link is very small, can only be viewed after scrolling down, and is not accompanied by any notification advising a user that the Terms are binding and should be read. Such an inconspicuous link does not put a user on inquiry notice under *Nguyen*. *Id*. Finally, Playtika points to no place within their mobile apps where a user can access the Terms of Service.

Playtika's argument that Wilson was an especially sophisticated app user who should be charged with knowledge of the Terms of Service is unpersuasive. Although Wilson may have

downloaded and played multiple gaming apps, this does not make him more likely to have knowledge of terms that are equally inconspicuous on each app. The cases cited by Playtika involving repeated website use do not support a contrary result. *See Domain Name Comm'n Ltd. v. DomainTools, LLC,* No. C18-0874RSL, 2018 WL 4353266, at *4 (W.D. Wash. Sept. 12, 2018) (holding that a valid agreement was formed because the user repeatedly conducted searches on the website and received a "clear notification" of the terms after each search); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) (noting that modern online consumers understand how hyperlinks work). Unlike *Domain Name Comm'n* and *Fteja*, Playtika's apps do not give users a "clear notification" regarding the Terms of Service.

Playtika argues that Wilson is trying to have his cake and eat it too by claiming that there was a gambling contract for purposes of personal jurisdiction but no contract to be bound by the Terms of Service. However, this misses the point that parties may agree to a contract without agreeing to a separate set of additional terms. In *Carnival Cruise Lines, Inc. v. Shute*, a case that Playtika cites, no one was arguing that the parties never contracted to purchase a cruise ticket. 499 U.S. 585, 587 (1991). Rather, the issue was whether they *also* agreed to be bound by the forum selection clause on the back of the ticket. *Id.* The two issues are distinct. Consequently, whatever other contracts Wilson may have entered into with Playtika, he did not agree to be bound by its Terms of Service.

## III.   Forum Non Conveniens

In the absence of an enforceable forum selection clause, Playtika still argues that Wilson's complaint should be dismissed under the doctrine of *forum non conveniens*. "The first requirement for a *forum non conveniens* dismissal is that an adequate alternative forum is available to the plaintiff." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1143 (9th Cir. 2001).

Ordinarily, an alternative forum need only be a jurisdiction where the defendant is amenable to service of process and the plaintiff can obtain "some remedy for his wrong." *Id.*

Here, these requirements are met. Playtika has assented to jurisdiction in Israel and is therefore amenable to service of process. *See* Motion, Dkt. #40, at 12. Playtika has also demonstrated that Wilson could obtain some redress for his claims under Israeli law, and Wilson does not argue otherwise. *See* Opp'n, Dkt. #48, at 15-16.

The second step of the *forum non conveniens* analysis requires analyzing the private and public factors for and against dismissal. "Ordinarily, a plaintiff's choice of forum will not be disturbed unless [these] factors strongly favor trial in a foreign country." *Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1445 (9th Cir. 1990) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). This is especially true when a plaintiff sues in their home forum, which is presumed convenient. *Lueck*, 236 F.3d at 1143 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981)). The private factors include "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir. 2001) (internal quotations omitted). The public interest factors include "(1) local interest of lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum." *Id.* at 1147.

Here, "the private interests point in both directions," and perhaps favor Israel slightly because more of the relevant evidence is likely in the hands of Playtika. *Piper Aircraft*, 454 U.S.

at 257. However, while witnesses and documents related to the development, marketing, or operation of Playtika's games may be in Israel, most if not all of that evidence will likely be capable of electronic transmission to the U.S. forum. Playtika can hire U.S. counsel, send documents on USB drives and discs, and have their witnesses deposed in Israel. Indeed, the most important evidence in this case is Playtika's apps themselves, which are obviously available in the U.S. because Wilson downloaded them there. Unlike *Piper Aircraft*, this is not a technically complex case that is likely to go to trial, but rather one that turns mainly on legal questions regarding whether Playtika's apps are illegal gambling under Washington law. *See id.* at 249 (emphasizing the need for flexibility in the *forum non conveniens* analysis because "[e]ach case turns on its facts."). Consequently, the private factors do not strongly support dismissal.

The public factors, on the other hand, strongly support allowing Wilson to bring his suit in Washington. Wilson has sued under Washington's gambling statute, which the state clearly has an interest in enforcing. Furthermore, Washington has a more general interest in ensuring that its residents are protected against the dangers of apps such as Playtika's, which may be designed thousands of miles away but are as accessible in Washington as any local product. The private and public factors are therefore not strong enough to defeat the presumption in favor of the Plaintiff's chosen forum.

## IV. Failure to State a Claim

### a. Legal Standard

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although the court must accept as true the Complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper 12(b)(6) motion to dismiss. *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnotes omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citing *id.*).

On a 12(b)(6) motion, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). However, where the facts are not in dispute, and the sole issue is whether there is liability as a matter of substantive law, the court may deny leave to amend. *Albrecht v. Lund*, 845 F.2d 193, 195–96 (9th Cir. 1988).

*b.*     *Whether Playtika's Virtual Coins are a "Thing of Value" under Washington Law*

In *Kater v. Churchill Downs Incorporated*, the Ninth Circuit reversed a district court's dismissal of a complaint substantially similar to Wilson's; indeed, both were filed by the same firm. 886 F.3d 784, 785 (9th Cir. 2018). There, as here, the defendant's gaming app awarded new players with an initial allotment of free chips that could be replenished through in-app

purchases or by winning games. *Id*. at 785-86. The Ninth Circuit held that the defendant's virtual chips were a "thing of value" because they allow a player to "place another wager or re-spin a slot machine," making them a "'credit . . . involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.'" *Id*. at 787 (quoting RCW § 9.46.0285). However, the court did not address the defendant's contention that players receive free chips throughout gameplay because it was not alleged in the complaint. *Id*. According to the defendant, such free awards meant that buying coins merely "enhance[s]" gameplay but is not necessary to extend it. *Id*.

Having identified this chink in Wilson's *stare decisis* armor, Playtika attacks it by attempting to distinguish the Complaint here from the one in *Kater*. Playtika first points to the Complaint's allegation that "Playtika provides visitors of its online slot machines a bundle of free 'coins' that can be used to wager on its games," but this refers to the same "initial allotment" of coins that was also alleged in *Kater*. Dkt. #1, at ¶ 2. However, Playtika also identifies two screenshots in the Complaint that demonstrate players' ability to gain additional free coins. *See id*. at §§ 27-28. One screenshot shows the "pop up" screen players encounter after running out of coins, which prompts them to "BUY COINS" and additionally suggests that they may "collect [a] Special Bonus when available in the lobby." *Id*. at ¶ 27. The other screenshot depicts the menu for purchasing coins, which contains a notification in the lower corner that the player has a "Free Store Bonus [of] 1,000 Coins." *Id*. at ¶ 28.

Although Wilson's allegations do not describe these aspects of the screenshots, the Complaint does locate the screenshots within the overall gameplay and explains what they generally depict. The Court can infer from these images that players can obtain *some* additional free coins after the initial allotment. The screenshots do not indicate how often such coins are

available, how many can be obtained, or what exactly can be done with them. The Court can therefore only consider whether some additional free coin allotments, however small or infrequent, remove Playtika's virtual coins from the statutory "thing of value" definition in RCW § 9.46.0285.

They do not. The Ninth Circuit reasoned that virtual coins are valuable because they "extend the privilege of playing" that is lost when a player runs out of free coins. *Kater*, 886 F.3d at 787. The court did not predicate its holding on whether this privilege was *permanently* lost, but instead explained that the privilege was lost when a player "must buy more chips" to keep playing. It therefore does not matter that a player may obtain more free coins at some future time because, until then, they must pay to extend their privilege of playing. Additional free coin allotments do not change the role of coins from "extension" to "enhancement" as Playtika argues. Motion, Dkt. #40, at 17.

*Bullseye Distributing LLC v. State Gambling Commission*, the case the Ninth Circuit mainly relied on in *Kater*, supports this conclusion. 127 Wash.App. 231 (2005). In *Bullseye*, players could obtain a sports card from an electronic slot machine either by inserting money into the machine, using credits earned from prior play sessions, or presenting a promotional voucher. *Id.* at 235. Despite the fact that players could obtain a new voucher each day through a number of means, the court still held that the credits earned from play sessions were a "thing of value" that extended the ability to play. *Id.* at 235, 242. Thus, just as the players in *Bullseye* could wait a day to regain their play privileges through a new voucher, Playtika's users can wait to obtain more

free coins. Nonetheless, in both cases, the credits and coins are a "thing of value" because they extend the privilege of playing for a potentially short period.[2]

In addition to the Complaint, Playtika also submits documentation with its Motion to Dismiss, including declarations, the Terms of Use, and several public records documents. These documents may only be considered if they fall within the exceptions to the "general rule [that] 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds)). There are two such exceptions. "First, a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment." *Id*. (quoting *Branch*, 14 F.3d at 453). If such documents are not attached to the complaint, the documents' authenticity must be uncontested and the complaint must necessarily rely on them. *Id*. (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998)). "Second, under Fed.R.Evid. 201, a court may take judicial notice of 'matters of public record.'" *Id*. at 688-89 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)). If the documents supplied by the defendant do not fall within either exception, the court must convert the motion to dismiss to a motion for summary judgment, and "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(c).[3]

---

[2] It is also worth pointing out that a "short" period of time can still cost a gambler a lot of money. Even if Playtika's apps award free coins every few hours, if those coins are only enough for a few minutes of gaming, filling the intervening time could be very expensive.

[3] Some courts have foregone such notice where the motion to dismiss alternatively requests conversion to summary judgment and both parties rely on the same documentary evidence. *See, e.g., Silk v. Metro. Life Ins. Co.*, 477 F. Supp. 2d 1088, 1091 (C.D. Cal. 2007); *Hotel St. George Associates v. Morgenstern*, 819 F.Supp. 310, 317 (S.D.N.Y.1993). Here, however, Wilson does not rely on the same documents as Playtika and disputes the authenticity and accuracy of Playtika's evidence.

Playtika asks the Court to consider the statement in its Terms that "[t]here is never any requirement to make any purchase of any kind to use the Service." Motion, Dkt. #40, at 17. The Court can take judicial notice of the Terms because they derive from a "publically accessible website." *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014). However, the statement Playtika quotes cannot be considered for the truth of the matter it asserts. Rather, the Court can merely take note of the fact that the Terms do in fact contain this statement, since Wilson's entire case is premised on disputing this contention. *See Lee*, 250 F.3d at 689-90 (holding that a court can take judicial notice of "matters of public record" but cannot credit the disputed factual assertions therein as true); Complaint, Dkt. #1, at 7 ("Once players run out of their allotment of free coins, they cannot continue to play the game without buying more.").

Playtika also refers to an SEC filing from 2016, which states that only 4.6 percent of Playtika players bought coins in 2016. Dkt. #41-1. While the Court would not normally be able to take judicial notice of the truth of this figure, Wilson does not dispute it.[4] Nonetheless, even if the Court considers the fact that the vast majority of players do not purchase coins, this has no bearing on whether they are a "thing of value" under the Ninth Circuit's reasoning. The fact that most players choose not to buy coins when their free allotment runs out does not change the fact that buying coins is still necessary to "extend the privilege of playing" until more free coins are awarded, leading some players to make purchases. *Kater*, 886 F.3d at 787.

Although not referenced in its argument, Playtika also submits the declaration of its Chief Financial Officer, which states, "The purchase of additional coins allows players to unlock additional, 'higher' levels of play with enhanced graphics, music or other virtual accoutrements

---

[4] In fact, the Complaint quotes an article explaining that "[m]any new mobile and social titles target small, susceptible populations for large percentages of their revenue." Dkt. #1, at 4.

or to progress faster through the game." Dkt. #41, at ¶ 15. While Wilson's Complaint does rely on Playtika's games as they existed before this suit began, it does not rely on a one-sided description of those games by the defendants themselves. The Court cannot therefore consider any such declarations at this stage. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997). However, it is worth noting that if buying additional coins *only* served the functions described in the declaration, the coins may in fact fall outside the "thing of value" definition. *See* RCW § 9.46.0285.

Finally, Playtika argues that the Court should disregard the Ninth Circuit's ruling in *Kater* as contrary the Washington Gambling Commission's statements regarding "social gaming," as well as other district court cases addressing the matter. To support its position, Playtika asks the Court to take judicial notice of a pamphlet released by the Commission in 2014 and a recent statement by the Commissioner regarding the Ninth Circuit's holding in *Kater*. These are both public records that the Court can properly take judicial notice of, as Wilson concedes. *See* Opp'n, Dkt. #52, at 20.

However, they do not support the conclusions that Playtika hopes for. While the pamphlet offered by Playtika does state that social gaming is not gambling if there is no prize, it also purports to provide only "general guidance" to consumers. Dkt. #43-1. The Ninth Circuit already declined to defer to this pamphlet, and the Court does the same here. *See Kater*, 886 F.3d at 788. Likewise, the Commissioner's statement regarding the Ninth Circuit's *Kater* ruling merely asserts that the Commission did not participate in the case and it may be appealed. It does not express any specific position with respect to the underlying issues.

Finally, to the extent that Playtika cites out-of-circuit cases holding that virtual coins are not a "thing of value," these merely persuasive authorities must be rejected in light of the Ninth

Circuit's holding. In fact, the Ninth Circuit already rejected these cases itself, stating that they involve "different state statutes, state definitions, and games." *Kater*, 886 F.3d at 788. With Playtika's ammunition thus depleted without success, the Court must follow the binding ruling in *Kater*.

c.     *Whether Players "Lose" such that Recovery is Possible*

Just as it rehashes the "thing of value" issue decided in *Kater*, Playtika also re-argues that Wilson cannot recover "the value of the thing . . . lost" under RCW § 4.24.070 because he did not "lose" anything. However, this argument rises or falls on the strength of Playtika's prior argument that its coins are not valuable because they are periodically given out for free. Because this argument has failed, it follows that Wilson did in fact lose something of value by playing Playtika's games and may now recover its value. *See Kater*, 886 F.3d at 789.

d.     *Whether Playtika's Games are "Bona Fide Business Transactions"*

Playtika also argues that its games are exempt from the statutory prohibition on gambling because they fall within the "bona fide business transaction" exception. This exception reads as follows:

> Gambling does not include fishing derbies as defined by this chapter, parimutuel betting and handicapping contests as authorized by chapter 67.16, bona fide business transactions valid under the law of contracts, including, but not limited to, contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including, but not limited to, contracts of indemnity or guarantee and life, health, or accident insurance.

RCW § 9.46.0237. According to Playtika, its games involve "bona fide business transactions" because players merely pay for the privilege of entertainment. The fact that players do not know how much entertainment they will receive does not make their games any different from buying tickets to a baseball game, which could go into extra innings or end relatively quickly.

Wilson responds that § 9.46.0237 contains a non-exhaustive list after "bona fide business transactions valid under the law of contracts" that identifies the purchase of securities and insurance as two examples. Wilson contends that, applying Washington principles of statutory interpretation, the exception should be limited to transactions similar to insurance and securities.

When construing a state statute, a federal court must apply that state's principles of statutory interpretation. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004). Washington courts view statutes using the "including but not limited to" language as unambiguously creating "an illustrative, not exhaustive, list." *State v. Joseph*, 416 P.3d 738, 741 (Wash. Ct. App.). This list of specific items modifies the general term, such that the latter "will be deemed to 'incorporate those things similar in nature or comparable to the specific terms.'" *Id.* (quoting *State v. Larson*, 184 Wash. 2d 843, 849, 365 P.3d 740, 743 (2015)). To determine what constitutes a "similar" item, courts look to the "clearly stated legislative intent" behind the statute. *Id.* at 741-42.

Here, the list clearly contemplates excluding purchases of securities or other investments and insurance. Buying virtual coins is not "similar in nature" to either of these transactions because the buyer is not protecting themselves against a fortuitous risk or obtaining a stake in a company.

Playtika argues that "bona fide business transactions valid under the law of contracts" is a broad category that unambiguously includes the sale of credits used for amusement games. In support of this, Playtika points to RCW § 9.46.010, which states that the Washington Gambling Act seeks to "avoid restricting participation by individuals in activities and social pastimes." However, the rest of this sentence limits the types of social pastimes to those that are "more for amusement rather than for profit, do not maliciously affect the public, and do not breach the

peace." RCW § 9.46.010. While the wording is ambiguous regarding *whose* profit is at issue, Playtika certainly profits from its games and Wilson would argue that they have a malicious effect on the public.

In any case, Playtika misconstrues the "transaction" that is at issue in this case. Whereas traditional gambling consists of a single transaction (money for a chance to win), Playtika's games divvy up this process between two transactions. The first is the purchase of virtual coins using real money, and the second is exchanging these coins for an opportunity to win more of them. This second transaction is what Wilson alleges is gambling, which is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW § 9.46.0237. Consequently, regardless of whether purchasing coins from Playtika is similar to buying tickets to a baseball game, using those coins to play Playtika's games is not a "bona fide business transaction." *Id.*

e.      *Whether Playtika Holding Company should be Dismissed*

Playtika argues that Playtika Holding Company (PHC) should be dismissed from the case because it does not own, offer or operate any games. Playtika supports this proposition with a statement from the declaration of PHC's Chief Financial Officer. Dkt. #41, ¶ 4. However, the Court cannot consider this declaration at the dismissal stage, and Playtika has alleged that PHC owns and operates the games at issue. *See* Complaint, Dkt. #1, ¶ 24. If PHC truly does not own, operate, or benefit from Playtika's games, it should be easy to dismiss them on summary judgment. However, the allegations in the Complaint are sufficient to keep them in the case for now.

**V.      Exclusion of House of Fun and Vegas Downtown Slots Claims**

Playtika asks the Court to strike all claims related to Vegas Downtown Slots because Wilson does not allege that he ever played that particular game. Wilson responds that the Complaint states that the proposed class includes people who played all of Playtika's games, and that material differences between the games can be addressed at class certification.

"Motions to strike are not favored and 'should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Luken v. Christensen Grp. Inc.*, No. C16-5214-RBL, 2016 WL 5920092, at *2 (W.D. Wash. Oct. 11, 2016) (quoting *Colaprico v. Sun Microsystem, Inc.*, 758 F.Supp. 1335, 1339 (N.D. Cal. 1991)). Rule 12(f) itself describes such matter as "redundant, immaterial, impertinent, or scandalous." The court should consider the pleadings in the light most favorable to the party who submitted them. *Id.* Motions to strike should be denied if there is "any doubt whether the allegations in the pleadings might be relevant in the action." *Id.*

Wilson could certainly not assert a claim based on the VDS game if he never played it because he could not possibly be "entitled to relief" for a non-existent injury. *See* Fed. R. Civ. P. 8(a)(2). The question, then, is whether the class allegations change this outcome. They do. The defining feature of class actions is the plaintiff's ability to assert claims on behalf of themselves and those similarly situated. It necessarily follows from this that the plaintiff will claim damages for harms that they themselves did not suffer, with the operative issue being whether those other harms are sufficiently similar to theirs.

Here, Wilson alleges that all of Playtika's games "function[] in a substantially similar fashion" by allowing players to buy and spend virtual coins for a chance to win more coins. *See* Complaint, Dkt. #1, at 7. As previously noted, the heart of this case sounds in contract, so whether or not Wilson's specific harm is "typical" of the class will turn on how the transactions

he entered into with Playtika compare with the rest of the class. It will not necessarily turn on which specific games Wilson played, except to the extent the games function differently such that Wilson entered into different types of transactions than some of the class members. In any case, that question should be addressed at the class certification stage, since there is no indication at this point that VDS functions so uniquely that the allegations related to that game are "immaterial." See Fed. R. Civ. P. 12(f).

Finally, Playtika argues that all claims related to House of Fun should be stricken because no Defendant owns, offers, or operates that game. However, because Playtika relies on declarations that cannot be considered at this stage of the litigation, the Court must credit Wilson's allegations that House of Fun is operated by Defendants.

## CONCLUSION

Defendant Playtika's Motion to Dismiss and Strike (Dkt. #40) is DENIED. Defendant Playtika's Request for Judicial Notice (Dkt. #43) is GRANTED.

IT IS SO ORDERED.

Dated this 20th day of November, 2018.

Ronald B. Leighton
United States District Judge