1
2
3
4
5
6
7

The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8
9

SEAN WILSON, individually and on behalf of
all other persons similarly situated,

10

 Plaintiff,

11

v.

12
13
14

PLAYTIKA, LTD., an Israeli limited company,
and CAESARS INTERACTIVE
ENTERTAINMENT, LLC., a Delaware limited
liability company.

15

 Defendants.

16

No. 18-cv-05277-RSL

**PLAINTIFF'S MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION**
**SETTLEMENT AGREEMENT**

Noting Date: January 15, 2021

17
18
19
20
21
22
23
24
25
26
27

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.    Class Counsel's 2015 Social Casino Lawsuits ....................................................... 3

II.   Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses .......... 4

III.  Class Counsel's Litigation Conduct Before This Court ........................................... 5

IV.   Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class ...................... 7

V.    The Settlement Now Before The Court ................................................................. 10

THE TERMS OF THE SETTLEMENT AGREEMENT .......................................................... 11

       A.    Settlement Class Definition ....................................................................... 11

       B.    Monetary Benefits ..................................................................................... 11

       C.    Prospective Relief ...................................................................................... 12

       D.    Release ...................................................................................................... 12

       E.    Attorneys' Fees and Expenses Requests & Incentive Award Requests ........ 12

ARGUMENT ...................................................................................................................... 12

I.    The Court Need Not Revisit Class Certification ................................................... 12

II.   Notice Was Successful And Satisfied Due Process ............................................... 13

III.  The Court Should Finally Approve The Settlement ............................................... 15

       A.    Class Counsel and the Class Representatives have adequately represented the Class and support the Settlement ....................................................... 16

       B.    The Settlement was negotiated at arm's length ......................................... 17

       C.    The amount offered in Settlement is adequate, taking into account the strength of Plaintiffs' case, and the risks inherent in further litigation ........ 18

              i.    The Settlement Class would have faced significant delay before it could have recovered anything on the merits ....................................... 18

1

ii.    Given the risks involved with further litigation, the amount offered in
        Settlement is outstanding ..........................................................................20

D.    The Settlement treats Settlement Class Members equitably ..........................22

E.    Class Counsel had completed sufficient discovery to reach an informed
        judgment about the benefits of settling, and the quality of the Settlement ....24

F.    The reaction of the Settlement Class has been favorable.................................24

**CONCLUSION** ....................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................. 13

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) .............................................................................. 2, 21

**United States Circuit Court of Appeals Cases**

*All. for Prop. Rights & Fiscal Responsibility v. City of Idaho Falls*,
    742 F.3d 1100 (9th Cir. 2013) ................................................................. 7

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ................................................................ 15, 25

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................. 12

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ......................................................... 15, 17, 18

*In re Equity Funding Corp. of Am. Securities Litig.*,
    603 F.2d 1353 (9th Cir. 1979) ................................................................. 23

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017) .................................................................. 2, 21

*Juris v. Inamed Corp.*,
    685 F.3d 1294 (11th Cir. 2012) ............................................................... 13

*Kater v. Churchill Downs*,
    886 F.3d 784 (9th Cir. 2018) ................................................................. 4, 19

*Mason v. Mach. Zone, Inc.*,
    851 F.3d 315 (4th Cir. 2017) ................................................................... 4

*Mullins v Direct Digital LLC*,
    795 F.3d 654 (7th Cir. 2015) ................................................................... 13

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..................................................... 17, 19, 20, 25

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

**United States District Court Cases**

*Aikens v. Panatte, LLC*,
No. 2:17-cv-01519 (W.D. Wash. Feb 5, 2019) ................................................ 13

*Bayat v. Bank of the West*,
No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) .............................. 18

*Benson v. DoubleDown Interactive, LLC*,
No. 18-cv-525 (W.D. Wash. June 17, 2020) ................................................ 19

*Clemans v. New Werner Co.*,
No. 3:12-cv-5186, 2013 WL 12108739 (W.D. Wash. Nov. 22, 2013) ............................ 25

*Dupee v. Playtika Santa Monica, et al.*,
No. 15-cv01021 (N.D. Ohio) ................................................ 3, 4

*Gragg v. Orange CAB Co., Inc.*,
No. 12-cv-0576 RSL, 2017 WL 785170 (W.D. Wash. Mar. 1, 2017) ............................ 17

*Helde v. Knight Transp., Inc.*,
No. 2:12-cv-00904 RSL (W.D. Wash. May 24, 2017) ................................................ 17

*Ikuseghan v. Multicare Health Sys.*,
No. 3:14-cv-05539 BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016) ............... 20, 24

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ................................................ 21

*In re Apple In-App Purchase Litigation*,
No. 5:11-CV-01758 EJD, 2013 WL 1856713 (N.D. Cal. May 2, 2013) ...................... 2, 20

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................ 17

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ........................ 21

*Kim v. Tinder, Inc.*,
No. CV 18-3093-JFW(ASX), 2019 WL 2576367 (C.D. Cal. June 19, 2019) ............. 20, 21

*Kater v. Churchill Downs Inc.*,
No. 15-cv-00612 (W.D. Wash) ................................................ *passim*

*Mason v. Mach. Zone, Inc.*,
No. 15-cv-01107 (D. Md.) ................................................ 4

*Pelletz v. Weyerhouser Corp.*,
    255 F.R.D. 537 (W.D. Wash. 2009) ................................................................... 25

*Phillips v. Double Down Interactive LLC*,
    No. 15-cv-04301 (N.D. Ill.) ............................................................................. 4

*Rinky Dink Inc. v. World Bus. Lenders, LLC*,
    No. C14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) .............................. 24

*Ristic v. Mach. Zone, Inc.*,
    No. 15-cv-08996 (N.D. Ill.) ............................................................................. 4

*Schneider v. Wilcox Farms, Inc.*,
    No. 07-CV-01160-JLR, 2009 WL 10726662 (W.D. Wash. Jan. 12, 2009) ..................... 25

*Walters v. Target Corp.*,
    No. 3:16-cv-1678-L-MDD, 2020 WL 6277436 (S.D. Cal. Oct. 26, 2020) ..................... 16

*Wilson v. Playtika, Ltd.*,
    349 F. Supp. 3d 1028 (W.D. Wash. 2018) ........................................................ 6

**Miscellaneous Authority**

2 McLaughlin on Class Actions
    § 6.23 (17th ed. 2020)................................................................................... 23

28 U.S.C. § 1292 ........................................................................................... 6

*Addicted to losing: How casino-like apps have drained people of millions*,
    NBC NEWS (Sept. 14, 2020), https://nbcnews.to/39Lo1X1 ............................... 10

Dean Takahashi, *13 predictions for the future of the $3.4B social casino games market*,
    GAMESBEAT (Oct. 19, 2015, 6:00 AM), https://bit.ly/37TPao9 ........................... 2

Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain
    Language Guide*,
    https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf .............................. 13

Fed. R. Civ. P. 23.............................................................................................*passim*

*Harpooned by Facebook*,
    REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019), https://bit.ly/39NIdri . 10

H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019) ........................................................ 8, 9

H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020) .................................................... 8, 9, 19

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

*How social casinos leverage Facebook user data to target vulnerable gamblers*,
 PBS NEWSHOUR (Aug. 13, 2019), https://to.pbs.org/3lPRd1m..........................................10

Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are
 considering a crackdown*,
 CROSSCUT (Feb. 7, 2020), https://bit.ly/3hfFxDl .............................................................10

Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino
 From Legal Trouble*,
 CASINO.ORG (Jan. 29, 2020), https://bit.ly/39dKtWM .......................................................8

S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019).........................................................................8, 9

S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020)............................................................................8

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1

**INTRODUCTION**

2    In 2018, on the heels of Class Counsel's appellate victory in *Kater*, Sean Wilson initiated

3    this lawsuit alleging that Defendants' social casinos are illegal gambling under Washington law.

4    Since that time, Plaintiff and his counsel have vigorously litigated this case before this Court, the

5    Ninth Circuit, the Washington State Gambling Commission, and even the Washington

6    Legislature. After substantial mediation efforts assisted by Phillips ADR, Plaintiff and

7    Defendants reached a class settlement, that creates, among other obligations, Defendants to

8    establish a non-reversionary $38 million common fund. The fund is sufficient to compensate

9    every class member who has ever lost money playing Defendants' social casino games is entitled

10   to a recovery and those with higher levels of losses are entitled to recover increasingly higher

11   percentages of their losses.

12   Utilizing data from Defendants and Platform Providers—entities through which Class

13   Members purchased chips to gamble at Defendants' social casinos—the Court-approved Notice

14   Plan has been successfully implemented. The reaction of the class to date has been exceptional:

15   thousands of Class Members have already submitted claims and the claims deadline is still

16   several weeks out. By contrast, no class members have requested exclusion or objected to the

17   settlement. Given the life-changing relief afforded, this volume of claims is not surprising and is

18   consistent with the projections made at preliminary approval. Participating Class Members stand

19   to recover substantial portions of their losses, with those who have lost the most standing to

20   recover more than half of their gambling losses. By way of example, Class Members with

21   Lifetime Spend Amounts of $10,000 stand likely to recover $2,200-$5,900 and Class Members

22   with Lifetime Spend Amounts of $100,000 stand likely to recover more than $50,000. Equally as

23   important, the settlement requires Playtika to provide addiction-related resources within its social

24   casino games and to create and honor a self-exclusion policy like those at Washington brick-and-

25   mortar casinos.

26   Given the novelty of Plaintiff's claim, Professor William B. Rubenstein (author of the

27   influential treatise *Newberg on Class Actions*) describes the recovery as an "astounding

1  accomplishment" and calls the relief provided "historic." And although there are no truly

2  comparable settlements, the closest factual analogue pales in comparison to the relief afforded

3  here. *See In re Apple In-App Purchase Litig.*, 5:11-CV-01758 EJD, 2013 WL 1856713.at *1

4  (N.D. Cal. May 2, 2013) (providing $5 to users of apps that "compel children playing them to

5  purchase large quantities" of in-game currency, "amounting to as much as $100 *per purchase* or

6  more") (emphasis added). So, too, do typical consumer privacy class settlements, which often

7  provide *cy pres* relief with no individual payments. *See In re Google Referrer Header Privacy*

8  *Litig.*, 869 F.3d 737, 740 (9th Cir. 2017), *vacated on other grounds by Frank v. Gaos*, 139 S. Ct.

9  1041 (2019).

10     For the reasons that follow, this settlement is fair, reasonable, and adequate the Court

11  should not hesitate to grant final approval.

12                                **BACKGROUND**

13     For the Court's convenience, the following "Background" section is included both in this

14  motion and in the contemporaneously-filed motion for attorneys' fees, expenses, and incentive

15  awards:

16     In 2014, Class Counsel began investigating the burgeoning social casino industry. *See*

17  Declaration of Todd Logan ("Logan Decl.") ¶ 3. The results of that investigation were startling:

18  multinational gambling corporations like Caesars Entertainment, Churchill Downs, International

19  Game Technology, and Scientific Games had found a way to smuggle slot machines onto

20  consumers' smart phones without complying with any federal or state gambling laws. *Id.* ¶ 4. By

21  2015, social casino games were capturing more than $3 billion in annual revenues.[1] Those

22  revenues, just like those of Vegas casinos, were disproportionately derived from gambling

23  addicts who just couldn't stop themselves from buying chips and spinning the slots. Moreover,

24  those revenues—at least in Class Counsel's judgment—were entirely ill-gotten gains under a

25  variety of state gambling laws. *See* Logan Decl. ¶ 4.

26  _____

27  [1]    *See* Dean Takahashi*, 13 predictions for the future of the $3.4B social casino games market*, GAMESBEAT (Oct. 19, 2015, 6:00 AM), https://bit.ly/37TPao9.

Based on that investigation, in 2015 Class Counsel initiated a nationwide, multi-forum campaign against the social casino industry. *See id.* ¶ 5. As Professor William B. Rubenstein, the sole author of *Newberg on Class Actions*, summarizes that campaign (and its results):

> Prior to entering academia, I was a lawyer at the national office of the American Civil Liberties Union (ACLU) for nearly a decade, during which time I pursued civil rights campaigns on behalf of minority groups. Based on that experience, it strikes me that what Class Counsel have pursued here is closer in form to a civil rights litigation campaign than it is to a series of discrete class action settlements. Class Counsel saw an injustice – a thinly disguised form of gambling preying on those most vulnerable to addictive gambling – and they sought to fix it. Their goal was not to win a case but to reform an entire industry, much like a civil rights campaign might aim to reform a particular type of discriminatory practice across an entire employment sector. To accomplish this end, Class Counsel went far beyond what lawyers pursuing a simple class action case would normally do. Class Counsel pursued multiple cases. Class Counsel pursued multiple defendants. Class Counsel filed actions in multiple forums. Class Counsel tested various state laws. Class Counsel built websites to help app users avoid forced arbitration clauses, lobbied legislators and regulators, and took their efforts to the media. When Class Counsel lost, they did not give up, but changed tactics or forums and kept going. And they did all of this with their own funds, risking millions of dollars of their own money to end this practice. What they have achieved so far, with these initial settlements, is an astounding accomplishment that begins to chip away at the pernicious underlying social casinos.

Declaration of Professor William B. Rubenstein ("Rubenstein Decl.") ¶ 2.

Because the extraordinary settlement here is but a part of Class Counsel's efforts carrying the banner nationwide for victims of the social casino industry, a summary of Class Counsel's efforts both before this Court and otherwise is provided below.

## I.    Class Counsel's 2015 Social Casino Lawsuits.

Having concluded that social casinos—including Caesars' and Playtika's "Caesars Slots" and "Slotomania"—constituted gambling, between April and October of 2015, Class Counsel filed (5) proposed class action lawsuits (including one against Caesars and Playtika), in four (4) different courts, alleging class claims under five (5) different sets of state gambling laws. *See* **(1)** *Dupee v. Playtika Santa Monica, et al.* No. 15-cv01021 (N.D. Ohio May 21, 2015) (alleging claims under Ohio and Nevada gambling laws); **(2)** *Kater v. Churchill Downs Inc.*, No. 15-cv-00612 (W.D. Wash. Apr. 17, 2015) (alleging claims under Washington gambling law); **(3)**

1  *Mason v. Mach. Zone, Inc.*, No. 15-cv-01107 (D. Md. Apr. 7, 2015) (alleging claims under

2  California and Illinois gambling laws) **(4)** *Phillips v. Double Down Interactive LLC*, No. 15-cv-

3  04301 (N.D. Ill.) (removed May 14, 2015) (alleging claims under Illinois gambling laws); and

4  **(5)** *Ristic v. Mach. Zone*, *Inc.* No. 15-cv-08996 (N.D. Ill.) (Oct. 9, 2015) (alleging claims under

5  Illinois gambling laws).

6         Each federal district court initially presented with Class Counsel's theory of these

7  cases—*i.e.*, that social casinos are illegal gambling and consequently must return to consumers

8  their ill-gotten gains—squarely rejected it. *See Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 316

9  (4th Cir. 2017); *Kater v. Churchill Downs Inc.*, No. C15-612 MJP, 2015 WL 9839755, at *3

10  (W.D. Wash. Nov. 19, 2015), *rev'd*, 886 F.3d 784 (9th Cir. 2018); *Dupee v. Playtika Santa*

11  *Monica*, No. 15-cv-01021, 2016 WL 795857, at *1 (N.D. Ohio Mar. 1, 2016); *Phillips v. Double*

12  *Down Interactive LLC*, 173 F. Supp. 3d 731, 739 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, No.

13  15-CV-8996, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016). In representative fashion,

14  Judge Pechman's dismissal order in *Kater* concluded that "Big Fish Casino does not award

15  something of value satisfying the requisite prize element, and therefore the game is not 'illegal

16  gambling' under Washington law." *Kater*, 2015 WL 9839755, at *3.

17  **II.    Class Counsel Appeals The *Kater* Dismissal And The Ninth Circuit Reverses.**

18         Following Judge Pechman's dismissal order in *Kater*, Class Counsel appealed. Merits

19  briefing before the Ninth Circuit concluded in September 2016, and oral argument was held in

20  February 2018. In March 2018, the Ninth Circuit reversed:

21         In this appeal, we consider whether the virtual game platform "Big Fish
        Casino" constitutes illegal gambling under Washington law. Defendant–
22        Appellee Churchill Downs, the game's owner and operator, has made
        millions of dollars off of Big Fish Casino. However, despite collecting
23        millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*,
        purports to be shocked—shocked!—to find that Big Fish Casino could
24        constitute illegal gambling. We are not. We therefore reverse the district
        court and hold that because Big Fish Casino's virtual chips are a "thing of
25        value," Big Fish Casino constitutes illegal gambling under Washington law.

26  *Kater*, 886 F.3d 784, 785 (9th Cir. 2018). In that opinion, the Ninth Circuit dispensed with a

27  variety of the arguments that had persuaded district courts nationwide to initially dismiss the

1  social casino cases. For example, the Court rejected the argument that social casino chips "do not

2  extend gameplay, but only enhance it." *Id.* at 787. The Circuit also rejected Big Fish's argument

3  that the Washington State Gambling Commission had determined that social casino games aren't

4  gambling, concluding that "these documents do not indicate that the Commission adopted a

5  formal position on social gaming platforms." *Id.* at 788. And the Ninth Circuit explicitly rejected

6  the "the reasoning of other federal courts that have held that certain 'free to play' games are not

7  illegal gambling." *Id.*

8  **III.     Class Counsel's Litigation Conduct Before This Court.**

9          Soon after remand in *Kater*, Class Counsel filed this proposed class action lawsuit on

10  behalf of Plaintiff Sean Wilson alleging that, like Big Fish Casino, Defendants' social casino

11  games—including "Slotomania," "House of Fun," "Caesars Slots," and "Vegas Downtown

12  Slots" (together, the "Applications")—constitute unlawful gambling under Washington's

13  gambling laws. *See* Dkt. 1.

14          In July 2018, Playtika moved to dismiss, arguing variously that the Court lacks personal

15  jurisdiction over it, that a forum selection clause required the Court to dismiss the case with

16  prejudice in favor of the dispute being litigated in Tel Aviv-Jaffa, Israel (and under Israeli law),

17  and that Wilson's claim failed because virtual coins in Playtika's Applications are not "things of

18  value." *See generally* Dkt. 40. To properly address Playtika's jurisdictional arguments, the

19  Parties stipulated to, and the Court granted, Plaintiff leave to conduct jurisdictional discovery.

20  *See* Dkts. 44, 45. With that discovery concluded, Plaintiff filed separate briefs: (1) opposing

21  Playtika's *forum non conveniens* motion, *see* Dkt. 48; (2) opposing Playtika's 12(b)(6) motion,

22  *see* Dkt. 52; and (3) opposing Playtika's personal jurisdiction motion, *see* Dkt. 57.

23          In November 2018, in a twenty-five page published opinion, the Court agreed with

24  Plaintiff, finding that Playtika is in fact subject to the Court's personal jurisdiction because

25  Playtika "used its apps to sell many coins to many users located in Washington," that Playtika's

26  forum selection clause arguments failed in part because the State of Washington has a strong

27  interest in "ensuring that its residents are protected against the dangers of" social casino apps,

1    and that Wilson adequately stated a claim because virtual chips in the Applications are a "thing

2    of value" and no relevant exceptions apply. *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028 (W.D.

3    Wash. 2018) (Dkt. 68). Playtika answered shortly thereafter. *See* Dkt. 74.

4         By prior agreement of the Parties, Caesars had reserved its pleadings motions pending the

5    Court's resolution of Playtika's pleadings motions. *See* Dkt. 37. And by additional agreement of

6    the Parties, Wilson and Playtika agreed to an elongated briefing schedule for Caesars's pleadings

7    motions, intended to allow Wilson adequate time to conduct appropriate jurisdictional discovery.

8    *See* Dkt. 71. In line with those agreements, shortly after the Court's denial of Playtika's motions

9    Caesars filed its own motion challenging the Court's jurisdiction and arguing that Wilson failed

10   to state a claim. *See* Dkt. 75. Over the coming months, the Parties engaged in substantial

11   jurisdictional discovery efforts, including Caesars's production of thousands of pages of

12   documents. *See* Dkt. 121 ¶ 3.

13        In March 2019, Playtika filed a motion pursuant to 28 U.S.C. § 1292(b) asking the Court

14   to certify for interlocutory appeal the order denying Playtika's motion to dismiss, arguing that

15   Plaintiffs' repeated use of Defendants' social casino games meant he had consented to

16   Defendants' forum selection provision. *See* Dkt. 79. Over Plaintiff's opposition, *see* Dkt. 84, that

17   motion was granted. *See* Dkt. 85. The Ninth Circuit initially stayed Playtika's petition for

18   permission to appeal pending resolution of appeals in the *Huuuge* and *DoubleDown* cases, where

19   the defendants similarly contended that plaintiffs were bound by arbitration provisions in part

20   because they repeatedly used the defendants' social casino apps. In March 2020, after plaintiffs

21   in those related cases prevailed in both appeals, the Ninth Circuit denied Playtika's petition. *See*

22   Dkt. 101.

23        Around the same time, Playtika filed a motion asking the Court to certify a trio of

24   questions to the Washington Supreme Court, essentially asking the Court to circumvent *Kater* by

25   giving the Washington Supreme Court an opportunity to determine that social casino chips are

26   not, in fact, "things of value." *See* Dkt. 99. Plaintiff opposed that motion, arguing both that it was

27   procedurally improper and Playtika was not entitled to a "second chance at victory" on an issue it

already lost. *See* Dkt. 102 at 2 (quoting *All. for Prop. Rights & Fiscal Responsibility v. City of Idaho Falls*, 742 F.3d 1100, 1108 (9th Cir. 2013)). The Court agreed with Plaintiff, denying Playtika's certification motion in May 2020. *See* Dkt. 113. In May 2020, the Parties agreed to attempt to resolve this case through mediation.

On June 10, 2020, the Parties reached an agreement in principle as to an appropriate settlement amount. *See* Dkt. 121 ¶ 9. Negotiations on remaining term sheet issues continued until a final term sheet was executed on June 12, 2020. *See id.* ¶ 10. But the negotiations didn't end there: for the next several weeks, the Parties worked out the details of a final and binding class action settlement agreement, exchanged several rounds of a working settlement document and supporting exhibits, met and conferred telephonically to flesh out the remaining disputed provisions, and began the process of meeting and conferring with the Platform Providers to design a robust notice and administration plan. *See id.* ¶ 11. On August 5, 2020, the Parties completed execution of the Settlement Agreement now before the Court. *See id.* ¶ 12. Wilson filed an unopposed motion for preliminary approval of that Agreement on August 23, 2020, *see* Dkt. 120, and the Court granted preliminary approval on August 31, 2020, *see* Dkt. 124.

## IV.    Class Counsel's Litigation-Adjacent Efforts On Behalf Of The Class.

As a necessary extension of the traditional litigation work necessitated by these cases, Class Counsel has for years undertaken all manner of litigation-adjacent work for the benefit of the Class. These efforts are organized into three categories and summarized below.

*First*, Class Counsel went great lengths to protect this litigation from collateral administrative attacks. Just two weeks after the Ninth Circuit's mandate issued in *Kater*, Defendants' industry peers dispatched their litigation attorneys to the Washington State Gambling Commission's ("WSGC") session in Tacoma to present a "Petition for a Declaratory Order" asking the Commission to declare that other social casino games "do[] not constitute gambling within the meaning of the Washington Gambling Act, RCW 9.46.0237." *Kater*, No. 15-cv-00612, Dkt. 79-5 at 1. At each of the three public hearings that followed—in July 2018 (in Tacoma), August 2018 (in Pasco), and October 2018 (in Olympia)—Class Counsel appeared

before the Commission, and Class Counsel presented live argument at both the Tacoma and Pasco hearings. *See* Logan Decl. ¶ 10. Class Counsel supplemented these appearances with a formal letter to the Commission (ahead of the Tacoma hearing) and, on the Commission's request, with an eighteen-page comment for the Commission's consideration (between the Tacoma and Pasco hearings). *Id.* The WSGC ultimately declined to enter a Declaratory Order. *See Kater*, No. 15-cv-00612, Dkt. 74-1. And even after the initial declaratory order proceedings, Class Counsel continued to represent the interests of the consumers in additional flare-ups before the WSGC, including in similar declaratory order proceedings initiated by The Stars Group. *See* Logan Decl. ¶ 11.

*Second*, Class Counsel has been the frontline opposition to the social casino industry's attempt to change Washington's gambling laws. Starting in early 2019, the International Social Gaming Association ("ISGA"), a trade organization co-founded by Playtika, provided legislators draft legislation that would amend Washington's gambling statutes with the effect (and specific intent) of gutting these lawsuits. *See* Logan Decl. ¶ 12. Over time, these efforts gained steam, with Senators Mark Mullet and John Braun, as well as Representatives Zack Hudgins, Brandon Vick, Bill Jenkin and Brian Blake, collectively sponsoring four (4) bills threatening to kill these cases by "clarifying" that players who lose money playing social casinos cannot recover under the Recover of Money Lost at Gambling Act ("RMLGA"). H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020); S.B. 6568, 66th Leg., Reg. Sess. (Wash. 2020); H.B. 2041, 66th Leg., Reg Sess. (Wash. 2019); S.B. 5886, 66th Leg., Reg. Sess. (Wash. 2019). Local and national media covered these efforts and left no doubt as to what the ISGA hoped to accomplish. *See, e.g.*, Phillip Conneller, *Washington State Social Gaming Legislation Could Rescue Big Fish Casino From Legal Trouble*, CASINO.ORG (Jan. 29, 2020), https://bit.ly/39dKtWM.

In response, Class Counsel engaged the lobbying firm Peggen & Mara Political Consulting LLP—experts in Washington tribal and gambling laws—to help Class Counsel (i) stay on top of all administrative and legislative developments in the Washington gaming industry; (ii) understand the intricacies of Washington's specific legislative process, including

the nuances of—and procedures for—bill drafting; (iii) understand who the relevant lawmakers and stakeholders in Washington's gaming industry were, what those lawmakers and stakeholders cared about, and how Class Counsel could educate those lawmakers and stakeholders about social casinos; and (iv) work with legislative groups, task forces, and other interested parties in in Washington's gaming industry, including the Washington Indian Gaming Association ("WIGA"). *See* Logan Decl. ¶ 13.

Class Counsel then used this information and expertise to amplify the Class's interests and concerns. Class Counsel drafted memos and prepared handouts for a variety of stakeholders, including State Senators and Representatives, the WIGA, the Washington Trial Attorneys' Association, the Public Interest Research Group, and other organizations dedicated to remedying problem gambling. *See id.* ¶ 14.

Class Counsel also personally met with lawmakers in the Washington Senate and House, met with officials in the Executive branch, and provided in-person testimony to the Washington Legislature. *See id.* ¶ 15. For example, in January 2019—after Class Counsel got wind that the ISGA was planning to gut Washington's gambling statutes (in what would become the failed H.B. 2041 and S.B. 5886)—Class Counsel met in-person with Representative Shelley Kloba, then-Representative (and now Senator) Derek Stanford, Lieutenant Governor Cyrus Habib, and several other government officials. *See id.* ¶ 16. On January 28, 2020, Class Counsel met with Senator Stanford at the State Capital—following Class Counsel's written and in-person testimony before the House Civil Rights & Judiciary Committee in (successful) opposition to H.B. 2720. *See id.* ¶ 17.

Class Counsel's efforts went beyond in-person testimony and meetings with legislative and executive officials. On March 21, 2019, Class Counsel sent formal correspondence to Senator Mark Mullet ahead of a planned work session before the Senate and Financial Institutions, Economic and Trade Committee about social casinos—in which Defendants' industry peers had been invited, but Class Counsel had not. *See id.* ¶ 18. In August 2019, Class Counsel traveled to Anacortes—on Swinomish Tribe land—to speak at a monthly WIGA

meeting, in opposition to the ISGA-backed bills. *See id.* ¶ 19. And in early 2020, Class Counsel coordinated the submission of more than 200 letters to Washington State Representatives from Big Fish Casino players across the country and spoke with local press about the ISGA's renewed efforts to gut these lawsuits. *See id.* ¶ 20; *see also* Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), https://bit.ly/3hfFxDl. These efforts held the line. Each bill introduced over the past two years has stalled.

*Third*, beyond Class Counsel's work on legislative and administrative fronts, Class Counsel also helped its clients sound the alarm on social casinos to the public at large by helping clients share their stories with local and national media, including in the following pieces:

- *Harpooned by Facebook*, REVEAL-CENTER FOR INVESTIGATIVE REPORTING (Aug. 3, 2019), https://bit.ly/39NIdri (featuring radio interview with Class Counsel's client)

- *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWSHOUR (Aug. 13, 2019), https://to.pbs.org/3lPRd1m (featuring television interview with Class Counsel's client)

- Melissa Santos, *'Free' casino apps prey on addiction, users say, and WA lawmakers are considering a crackdown*, CROSSCUT (Feb. 7, 2020), https://bit.ly/3hfFxDl (featuring Class Counsel's clients and Class Counsel Alexander Tievsky)

- *Addicted to losing: How casino-like apps have drained people of millions*, NBC NEWS (Sept. 14, 2020), https://nbcnews.to/39Lo1X1

## V.    The Settlement Now Before The Court.

Following all of these efforts, and with the assistance of Phillips ADR, Class Counsel reached a settlement with Defendants that provides a non-reversionary cash recovery of $38 million from which every Class Member who has ever lost money playing Defendants' social casino games is entitled to recover a substantial portion of their losses back. *See* Dkt. 121-1 § 1.32. Class members with higher levels of losses are entitled to recover increasingly higher

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

percentages of their losses, and the upper echelons of "VIP" players stand to recover more than half of their losses. *See id.* §§ 1.36, 2.1(c). The settlement also requires Defendants to implement meaningful prospective relief, including by providing addiction-related resources within their social casino games and by creating and honoring a self-exclusion policy akin to what one might expect to soon see at the Emerald Queen or the Muckleshoot casinos. *See id.* § 2.2.

## THE TERMS OF THE SETTLEMENT AGREEMENT

For the Court's convenience, the key terms of the Agreement are summarized below.

**A.**  **Settlement Class Definition:** The Settlement Class is defined as follows: "all persons who played the Applications on or before preliminary approval of the settlement while located in the state of Washington."[2] *See id.* § 1.33.

**B.**  **Monetary Benefits:** Defendants have agreed to establish a $38,000,000.00 Settlement Fund from which Settlement Class Members who file a valid claim will be entitled to recover a cash payment, after deducting costs and administrative expenses, any fee award to Class Counsel, and any incentive payments to the Class Representatives. *See id.* § 1.32. No portion of the Settlement Fund will revert to Defendants. *Id.* § 2.1(i). Any Settlement Class Member checks not cashed within 90 days of issuance will be either be placed in a second distribution fund or donated to a Court-approved *cy pres* recipient. *Id.* § 2.1(h). As described in detail in the Plan of Allocation, the amount of each Settlement Class Member's payment will vary based on the Settlement Class Member's total losses (those with higher loss amounts are eligible to recover a greater percentage of their losses) and overall Settlement Class Member participation levels. *See id.* §§ 1.36, 2.1(c), Exhibit E. Based on its experience, Heffler Claims Group (the "Settlement Administrator") anticipates that participating Settlement Class Members in the highest category of Lifetime Spending Amounts will recover the majority of their losses,

---

[2]    Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this action and members of their families, (2) the Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former officers, directors, and employees, (3) persons who properly execute and file a timely request for exclusion from the class, and (4) the legal representatives, successors or assigns of any such excluded persons. *See* Agreement § 1.33.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1   and that participating Class Members in the smallest category of Lifetime Spending Amounts

2   will recover more than 10% of their losses. *See* Dkt. 122 ¶ 15. Settlement Class Members will be

3   able to quickly and easily estimate the amount of their potential payment on the Settlement

4   Website. *See* Agreement § 4.2(c).

5       **C.      Prospective Relief:** Defendants have agreed to establish a voluntary self-

6   exclusion policy that will allow players to exclude themselves from further gameplay. *See id.*

7   § 2.2. Defendants must also make a link to that policy prominently available within the games,

8   and their customer service representatives will provide the link to players who contact them and

9   reference or seek help for video game behavior disorders. *See id.* Defendants have also agreed to

10  other prospective relief measures, including changes to game mechanics such that when players

11  run out of virtual chips, they won't need to purchase additional chips or wait to receive free

12  additional chips to keep playing Defendants' games. *See id.*

13      **D.      Release:** In exchange for the monetary relief described above, Defendants and

14  other entities, including the Platform Providers Facebook, Apple, Google, Amazon, Microsoft,

15  and Samsung, will be released from all claims raised in these cases relating to the operation of

16  Defendants' social casino games and the sale of virtual chips in those games, including claims

17  that the games were illegal gambling or the chips were "things of value." The full release is

18  contained at *id.* § 1.27.

19      **E.      Attorneys' Fees, Expenses Requests & Incentive Award Requests:**

20  Contemporaneously with the filing of this motion, Class Counsel are filing a motion for

21  attorneys' fees, expenses, and incentive awards.

22                                          **ARGUMENT**

23  **I.      The Court Need Not Revisit Class Certification.**

24      A threshold inquiry at final approval is whether the Class satisfies the requirements of

25  Federal Rule of Civil Procedure 23(a) and (b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

26  1019-1022 (9th Cir. 1998). Because no relevant facts have changed since the Court certified the

27

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1  Settlement Class, Dkt. 221, the Court need not revisit class certification here. *See, e.g.*, *Aikens v.*

2  *Panatte, LLC*, No. 2:17-cv-01519, Dkt. 54 (W.D. Wash. Feb 5, 2019) (Lasnik, J.).

3  **II.    Notice Was Successful And Satisfied Due Process.**

4        Prior to granting final approval to this Settlement, the Court must consider whether the

5  Class members received "the best notice that is practicable under the circumstances, including

6  individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

7  P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). "The rule does

8  not insist on actual notice to all class members in all cases." *Mullins v Direct Digital LLC*, 795

9  F.3d 654, 665 (7th Cir. 2015); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir.

10  2012) (noting that "even in Rule 23(b)(3) class actions, due process does not require that class

11  members actually receive notice" and collecting cases). Although what constitutes the "best

12  notice practicable" is case-specific, the Federal Judicial Center has noted that a notice campaign

13  that reaches 70% of a class is often reasonable. Federal Judicial Center, *Judges' Class Action*

14  *Notice & Claims Process Checklist & Plain Language Guide*, at 3 (2010), *available at*

15  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

16        The Court already provisionally approved the Notice Plan proposed by the Class

17  Representatives and Class Counsel. Dkt. 124 at 5-6. That plan utilized both direct and

18  publication notice to the Settlement Class. *Id.* To provide direct notice to all who were eligible to

19  submit a claim for payment from the Settlement, Class Counsel worked with Counsel for

20  Defendants and also subpoenaed a variety of third parties to obtain contact information for

21  everyone with a Lifetime Spending Amount of greater than zero (*i.e.*, those who are entitled to

22  make a claim against the Settlement Fund). *See generally* Declaration of Brian Smitheman

23  ("Smitheman Decl."). As the Court is well aware, this was not an easy process. Class Counsel

24  engaged in extensive negotiations with Platform Providers. Apple, Google, Facebook, and

25  Microsoft ultimately provided Class Counsel with sufficient data to effectuate the Notice Plan.

26  Class Counsel was forced to move to compel the necessary data from Amazon. *See Kater*, No.

27  15-cv-00612, Dkt. 224. Ultimately, after two orders from this Court (*see Kater*, No. 15-cv-

1    00612, Dkts. 250, 256)—and then even further negotiations—Amazon provided the necessary

2    information. *Cf.* Smitheman Decl. ¶ 5.

3        Once that data was collected, it was transmitted to Heffler Claims Group LLC, the

4    Settlement Administrator, to compile a complete Class List. The Defendants and Platform

5    Providers ultimately provided Heffler with contact information for approximately 280,000

6    accounts, and Heffler created a notice list of 294,142 emails. *See id.* ¶ 11. Heffler then sent out

7    two rounds of email notice. In the first round, which did not contain accounts associated with

8    Amazon because Amazon had not yet produced that data, 220,606 emails were successfully

9    delivered. *See id.* ¶ 12. In the subsequent round, which did include Amazon data, Heffler emailed

10   211,657 reminder notices to Class Members who had not yet filed a claim. *See id.* ¶ 15. Of the

11   reminder emails sent, 209,653 (or 99%) were successfully delivered. *See id.*

12       Additionally, using the information provided by Defendants and the Platforms, Heffler

13   sent postcard notice via U.S. First Class mail to 53,446 accounts identified as having Lifetime

14   Spending Amount of $100 or more. *See id.* ¶ 10. Heffler further sent postcard notice to Class

15   Members whose email notice bounced. *See id.* As of December 10, 2020, Heffler received 21

16   Notices returned by USPS with a forwarding address, and then re-mailed those Postcard Notices

17   to the updated address. *See id.* ¶ 13. As of December 10, 2020, 421 Postcard Notices were

18   returned as undeliverable by the USPS without a forwarding address. *See id.* ¶ 14.

19       Direct notice was to be supplemented by online publication notice in the form of digital

20   advertisements targeted to be seen by individuals most likely to be part of the Settlement Class.

21   Given the extent to which social casino players are active on social media, Heffler purchased

22   sponsored ads on Facebook, Instagram, YouTube, and Twitter. *See id.* ¶ 6. These social media

23   ads, coupled with traditional internet banner advertisements, generated more than 23 million

24   impressions. *See id.* ¶ 8. In addition, keyword search targeting was used to show advertisements

25   to users in Google search results and their Gmail inboxes, and streaming radio ads were

26   purchased on Pandora. *See id.* ¶¶ 10, 14.

27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1    Overall, the Notice Program, including direct email and postcard notice as well as best in-

2    class tools and technology, reached at least 82% of Settlement Class Members in Washington.

3    *See* Declaration of Jeanne Finegan ("Finegan Decl.") ¶ 3.

4    Finally, all forms of notice accurately described the Settlement and directed the recipient

5    to the Settlement Website, where Class Members can review the Plan of Allocation, use a slider

6    tool to estimate in real time how much of their losses they are projected to recover through the

7    Settlement, and file a claim. *See* Agreement § 4.2(c); Dkt. 120 at 6-7.

8    This all confirms what the Court already provisionally found: the Notice Plan here, which

9    reached at least 82% of Settlement Class Members in Washington, *see* Finegan Decl. ¶ 3,

10    constituted the "best practicable notice" under the circumstances, and was reasonably calculated

11    to apprise interested Settlement Class Members of their rights under the Settlement. As far as

12    Class Counsel is aware, there have been no issues noticing the Settlement Class, and most recent

13    figures confirm the estimates provided to the Court at preliminary approval. The Court should

14    therefore find that the Notice Plan ultimately complied with Due Process.

15    **III.    The Court Should Finally Approve The Settlement.**

16    To approve the settlement of a class action as fair, reasonable, and adequate, Rule 23(e)

17    requires Court to consider "whether (A) the class representatives and class counsel have

18    adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

19    provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

20    appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

21    the method of processing class-member claims; (iii) the terms of any proposed award of

22    attorney's fees, including timing of payment; and (iv) any agreement required to be identified

23    under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

24    These factors largely encompass those identified by the Ninth Circuit for evaluating a class

25    settlement. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

26    (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

27

Motion for Final Approval
CASE NO. 18-CV-5277 - 15

1    The Committee Notes to the recent revision of Rule 23 make clear that the newly

2    enumerated factors were not intended to replace approval factors already used in courts around

3    the country, but "rather to focus the court and the lawyers on the core concerns of procedure and

4    substance that should guide the decision whether to approve the proposal." Thus, courts examine

5    the new Rule 23 factors alongside the traditional *Churchill* factors relevant to the particular case,

6    mindful that there is considerable overlap between the two. *See, e.g.*, *Walters v. Target Corp.*,

7    No. 3:16-cv-1678-L-MDD, 2020 WL 6277436, at *5 (S.D. Cal. Oct. 26, 2020).[3]

8        **A.**    **Class Counsel and the Class Representatives have adequately represented
9    the Class and support the Settlement.**

10    Class Counsel's representation of the Class' interests here was not just adequate; it was

11    extraordinary. Class Counsel filed this case, in 2018, after obtaining a landmark Ninth Circuit

12    ruling in the related *Kater* matter. From the start, Class Counsel had to defend Washington's

13    gambling laws from repeated attacks both in the WSGC and in the Washington State Legislature.

14    All the while, Class Counsel dealt with motion after motion after motion from both

15    Defendants—including a *forum non conveniens* motion, a 12(b)(6) motion, a personal

16    jurisdiction motion, and a motion to certify key issues to the Washington Supreme Court. *See*

17    Dkts. 48, 52, 57, 84. Time and time again, Class Counsel held the line and marched the case

18    closer to class certification and trial, ultimately leading to the Settlement now before the Court.

19    All of these efforts demonstrate that Class Counsel provided more than adequate service to the

20    Class in this case.

21    Class Representatives Wilson, Burdick, Taylor, and Thibert likewise adequately

22    represented the Class. Each communicated with Class Counsel, responded to requests for

23    information, closely reviewed the terms of the Settlement, discussed the Settlement with Class

24    Counsel, and signed the Settlement because they believe it is fair and in the best interests of the

25    Class. *See* Declaration of Sean Wilson ("Wilson Decl.") ¶ 5; Declaration of Cathy Burdick

26

27    [3]    There is no governmental participant here, so that factor is neutral. Further, to date, there are no agreements that must be identified under Rule 23(e)(3), nor do counsel anticipate reaching any such agreements.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378

1    ("Burdick Decl.") ¶ 3; Declaration of David Taylor ("Taylor Decl.") ¶ 3; and Declaration of

2    Jesse Thibert ("Thibert Decl.") ¶ 3. Their services were more than adequate.

3        The Court may also consider Class Counsel's support of the Settlement, which also

4    favors approval. *In re Bluetooth*, 654 F.3d at 946. It is well-established that "[t]he

5    recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *In re*

6    *Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (quotations omitted).

7    Class Counsel here are the only lawyers with experience prosecuting these types of claims, and it

8    is their considered judgment that this Settlement represents an outstanding result for the

9    Settlement Class.

10       **B.    The Settlement was negotiated at arm's length.**

11       There can be no serious question that the Settlement here was negotiated at arm's length

12   and was the product of non-collusive negotiations—as the Court has already preliminarily found.

13   *See* Dkt. 124 at 4. That the Settlement was reached only after weeks of arms-length negotiation,

14   during which time the Parties exchanged substantive briefing on the core legal issues and were in

15   near-daily communication with an ADR team lead by Judge Phillips (ret.), supports a finding

16   that there was no collusion here. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

17   2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

18   resolution."); *Helde v. Knight Transp., Inc.*, No. 2:12-cv-00904 RSL, Dkt. 191 at 2 (W.D. Wash.

19   May 24, 2017) (granting preliminary approval where "Settlement Agreement resulted from

20   extensive arm's-length negotiations, with participation of an experienced mediator"); *Gragg v.*

21   *Orange CAB Co., Inc.*, No. 12-cv-0576 RSL, 2017 WL 785170, at *1 (W.D. Wash. Mar. 1,

22   2017) (same). The Parties reached this Settlement only after years of intense litigation marked by

23   round after round of contested issues. Indeed, it is safe to say that Class Counsel and defense

24   counsel agreed on almost nothing of substance over the course of this litigation.

25       Moreover, this Settlement contains none of the red flags the Ninth Circuit has identified

26   as indicative of possible collusion: (1) "when counsel receive a disproportionate distribution of

27   the settlement, or when the class receives no monetary distribution but class counsel are amply

1    rewarded," (2) "when the parties negotiate a 'clear sailing' arrangement," and (3) "when the

2    parties arrange for fees not awarded to revert to defendants rather than be added to the class

3    fund." *In re Bluetooth* 654 F.3d at 947 (quotations omitted). Class Counsel's fee will be

4    determined separately, but as explained in Class Counsel's fee petition, they seek a percentage

5    recovery that is consistent with Washington law and Ninth Circuit precedent, reflects their work

6    here, and is proportionate. Moreover, the Settlement does not contain a "clear sailing"

7    agreement; Defendants are free to object to Class Counsel's fee petition if they so desire. *See*

8    Agreement § 8.1. And there is no reverter here. All Settlement funds will go to Class Members,

9    less Class Counsel's fees and any administrative costs. *See id.* § 1.35. This consideration clearly

10    supports final approval.

11

12           **C.**       **The amount offered in Settlement is adequate, taking into account the**
                   **strength of Plaintiff's case, and the risks inherent in further litigation.**

13

14         Even before the revised Rule 23 highlighted that the Court should consider the amount

15    offered in settlement, courts recognized that the size of any settlement, compared to the

16    likelihood of full recovery, "is generally considered the most important" factor in evaluating a

17    settlement. *See Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D.

18    Cal. Apr. 15, 2015). Here, an evaluation of the risks present in this litigation, combined with an

19    assessment of the scope of relief, shows that the Settlement easily qualifies as fair, reasonable,

20    and adequate.

21

22           **i.**       **The Settlement Class would have faced significant delay before it**
                 **could have recovered anything on the merits.**

23

24         Ultimately, Class Counsel believes in the strength of these cases on the merits. The key

25    legal questions, particularly under the RMLGA, are straightforward, and in Class Counsel's view

26    have been conclusively answered by the Ninth Circuit's decision in the appeal in the *Kater*

27    matter. Nevertheless, the case presented some legal risks. For instance, Defendants here raised

the contention that the regular provision of free chips within their gambling games meant that the chips themselves were not "things of value." *See, e.g.*, Dkt. 99 (seeking to certify issue to the Washington Supreme Court); *accord Benson v. DoubleDown Interactive*, No. 18-cv-525, Dkt. 103 (W.D. Wash. June 17, 2020) (same). Plaintiff, of course, disagrees, and this Court has dismissed that contention at every turn, relying on the Ninth Circuit's decision in *Kater*. But it is also true that the opinion in *Kater* specifically notes that the court did not consider the defendants' specific arguments about the regular provision of free chips. *See* 886 F.3d at 787.

Moreover, as Plaintiff explained at preliminary approval, the principal risk here was legislative—*i.e.*, the chance that Defendants' efforts at changing the law, either through the Washington Legislature or the WSGC, would succeed before this matter reached judgment and leave Settlement Class Members with nothing. Class Counsel have thus far fended off the ISGA's phalanx of well-heeled lobbyists, but Defendants and their ISGA comrades are formidable opponents. If these cases do not settle now, each legislative cycle the class will be at risk of having their claims eviscerated in the name of "remov[ing] . . . economic uncertainty" by "clarifying" that proposed class members cannot recover under the RMLGA. H.B. 2720, 66th Leg., Reg. Sess. (Wash. 2020).

This legislative risk is particularly acute here because it is practically inevitable that this case would take years to reach judgment. Merits discovery was only in its nascent stages, and—based on the flurry of briefing on the pleadings alone—there is every reason to believe that the Parties would have fought tooth and nail on every issue had the case not settled. Such discovery fights would inevitably prolong the discovery period here, after which the Parties would heavily contest class certification and, perhaps, summary judgment, and then trial. The history of the case so far also suggests that any trial verdict was bound to be appealed, further lengthening the proceedings.

Courts have regularly recognized that the prospect of significant delay while a case works its way to judgment is reason to favor immediate settlement. After all, one dollar today is worth significantly more than one dollar three years from now. *Rodriguez*, 563 F.3d at 966 ("Inevitable

1    appeals would likely prolong the litigation, and any recovery by class members, for years. This

2    factor, too, favors the settlement."); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-cv-05539

3    BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) ("[T]he outcome of trial and any

4    appeals are inherently uncertain and involve significant delay. The Settlement avoids these

5    challenges."). But delay is especially problematic here. The longer the case survives, the more

6    opportunities Defendants and their allies would have to effect retroactive change to the law.

7            **ii.    Given the risks involved with further litigation, the amount offered in
               Settlement is outstanding.**

8

9        The most significant aspect of the secured by this Settlement is the $38 million non-

10    reversionary common fund, which will be used to help Settlement Class Members recoup their

11    losses. That is an "astounding" recovery. Rubenstein Decl. ¶ 2. It is a significant enough sum that

12    Class Members with the largest Lifetime Spending Amounts stand to recover more than 50% of

13    their losses, and that no participating class member is likely to recover less than 10% of their

14    losses. *See* Dkt. 122 ¶¶ 13-16. By way of example, Class Members whose losses are

15    approximately $10,000, $30,000, and $100,000, respectively, are projected to recover $1,500-

16    $2,500 ($10,000), $7,500-$13,500 ($30,000), and $50,000+ ($100,000). It is difficult to compare

17    this recovery to the recovery provided for under other comparable settlements, given that this

18    case has no true peers to be reasonably measured against. On the facts, the closest comparator is

19    almost certainly *In re Apple In-App Purchase Litigation*, in which the class alleged that certain

20    apps offered within Apple's App Store were "highly addictive, designed deliberately so, and tend

21    to compel children playing them to purchase large quantities" of in-game currency, "amounting

22    to as much as $100 *per purchase* or more." 2013 WL 1856713, at *1 (emphasis added). But

23    there, the settlement established no common fund at all, the default recovery for participating

24    class members was five dollars (yes, $5), and with adequate proof some claiming class members

25    could claim refunds for a single 45-day period of purchases. *Id.* at *5. Similarly, in *Kim v.*

26    *Tinder, Inc.*, the class alleged unfair pricing with regard to in-app purchases in a popular dating

27    app. No. CV 18-3093-JFW(ASX), 2019 WL 2576367, at *2 (C.D. Cal. June 19, 2019). The

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1   settlement established no common fund at all, and participating class members received 50 free

2   "Super Likes" (*i.e.*, coupons) in addition to an option to select a $25 cash payment (as an

3   alternative to other coupon offers). *Id.* Without meaning to punch down, there is just no

4   comparison between the settlements that have ever previously been reached in factually-similar

5   cases to the settlement currently before the Court.

6       Perhaps the better measuring stick for this settlement are class action settlements in the

7   consumer privacy space, given that those settlements often resolve large (statutory) damages

8   claims and are premised on novel interpretations of law as applied to allegations of internet-

9   based misconduct. Consumer privacy settlements, too, are notorious for failing to provide

10  consumers with real-world relief for the damages they have suffered. For example, *In re Google*

11  *Referrer Header Privacy Litigation*, 869 F.3d at 740, approved the settlement where all of the

12  money was to go to *cy pres*, with no cash relief for the class at all. *Gaos*, 139 S. Ct. at 1045. And

13  even in consumer privacy settlements that do provide monetary relief and have been adjudged to

14  be fair and reasonable by district courts, the relief is often primarily in-kind. *See, e.g.*, *In re*

15  *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 324 (N.D. Cal. 2018) (explaining that less than

16  10% of the "fund" was available for cash payments, with the rest being reserved to purchase

17  credit monitoring services); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-

18  02752-LHK, 2020 WL 4212811, at *22 (N.D. Cal. July 22, 2020) (cash relief made available

19  only to class members with existing credit monitoring, out-of-pocket losses, and who paid

20  Yahoo! for premium services).

21      And beyond the cash recovery, the Settlement provides for substantial non-monetary

22  benefits. The Settlement requires Playtika to implement meaningful prospective relief, including

23  by providing addiction-related resources within its social casino games and by creating and

24  honoring a meaningful self-exclusion policy. *See* Agreement § 2.2. Given the fervor with which

25  Defendants have long insisted that their games are not gambling, these in-game changes are a

26  monumental achievement for the Settlement Class. They represent the first steps toward much-

27  needed self-regulation within the social casino industry, and given Playtika's prominence in the

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

1  social casino industry, other industry players have and will continue to follow suit.

2  These measures also highlight that resolving this case now is itself a benefit. Recall that

3  Plaintiff alleges that many members of the Settlement Class are problem gamblers, whose

4  addictions cause real-world problems like devastating credit card bills. Had the case not settled,

5  Settlement Class Members would have continued to suffer these and other similar harms,

6  perhaps with devastating and irreversible consequences in some cases. Bringing this litigation to

7  a beneficial conclusion now will forestall these harms from occurring, a potentially incalculable

8  benefit to some Settlement Class Members.

9  In sum, the amount offered in the Settlement, when compared with the risks and expense

10  of further litigation, strongly supports final approval.

11  **D.      The Settlement treats Settlement Class Members equitably.**

12  The revised Rule 23 further asks courts to assess whether the proposed settlement "treats

13  class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). The Rule's revised

14  text makes clear that *equal* treatment is not required, but fair treatment is instead the goal. The

15  Settlement here achieves that goal.

16  As the Court explained at preliminary approval, and as hashed out in detail in the Plan of

17  Allocation, a Settlement Class Member's total recovery will depend on the extent of their losses

18  (*i.e.*, those with greater losses will recover a higher proportion of their losses). *See* Dkt. 124 at 3.

19  The Plan of Allocation therefore distributes Settlement funds according to those who have

20  suffered the greatest harm.

21  Allocating settlement funds in this way achieves an equitable result. Settlement Class

22  Members with tens or hundreds of thousands of dollars in losses have frequently suffered serious

23  collateral harms, such as alienation from family or friends, or the accrual of huge debts, that were

24  not suffered by those who may have purchased $10 or $20 worth of chips. And even though all

25  Settlement Class Members have equally strong RMLGA claims, Settlement Class Members with

26  huge losses who accessed Defendants' VIP tiers and interacted with a VIP host may have a

27  stronger CPA claim to release here. As explained above, in Class Counsel's view, the Class

1  stands largely on equal footing. But a clear-eyed assessment of the risks that lay ahead

2  demonstrates that certain claims are stronger than others, something appropriately reflected in

3  the Plan of Allocation. *See In re Equity Funding Corp. of Am. Securities Litig.*, 603 F.2d 1353,

4  1365 (9th Cir. 1979) (concluding that the district court's approval of certain offsets "in [a] Plan

5  of Allocation was a component of its duty to insure the equitable distribution of the settlement

6  proceeds"); 2 McLaughlin on Class Actions § 6.23 (17th ed. 2020) ("Allocation formulas,

7  including certain discounts for certain types of claims within a class, may properly take into

8  consideration the comparative strengths and values of different categories of the settled and

9  released claims.").

10      Likewise, the provision of service awards for the Named Plaintiff and other class

11  representatives are consistent with the equitable treatment of class members. Sean Wilson seeks

12  an award of $5,000. This modest award reflects his service to the Class. Mr. Wilson put his name

13  to a lawsuit that advanced a novel theory and that ultimately allowed injured individuals to

14  recoup thousands of dollars in losses. While that is typical of class plaintiffs, the risk of

15  reputational injury here is higher, given the subject matter of the lawsuit. Mr. Wilson also

16  reviewed pleadings and participated in the settlement process. As explained in the separate

17  motion for incentive awards, an award of this size is in line with other awards given to class

18  representatives, and fairly reflects his service to the Settlement Class. Given that his efforts were

19  key to ensuring that the Settlement Class recovered anything, the modest proposed incentive

20  award for Wilson is fully consistent with equity.

21      David Taylor, Cathy Burdick, and Jesse Thibert each seek an award of $1,000. This

22  modest award, too, is equitable, given their respective contributions to the Settlement Class.

23  Each reviewed the terms of the settlement and ultimately stepped forward to share their approval

24  of the settlement with the public—helping demonstrate the settlement's success. The proposed

25  $1,000 incentive award for these services is also fully consistent with equity.

26      In sum, the Settlement treats all Class Members equitably relative to each other,

27  supporting final approval.

**E.    Class Counsel had completed sufficient discovery to reach an informed judgment about the benefits of settling, and the quality of the Settlement.**

Next, the Parties "had enough information to make an informed decision about the strength of their cases and the wisdom of settlement." *Rinky Dink Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC, 2016 WL 4052588, at *5(W.D. Wash. Feb. 3, 2016). The Parties only agreed to mediate after more than two years of contentious of litigation, and consequently negotiated with a crystal-clear understanding of the strengths and weaknesses of the Parties' claims and defenses. *See* Dkt. 121 ¶ 9. This included substantial jurisdictional discovery efforts, including Caesars's production of thousands of pages of documents. *Id.* ¶ 3.

Moreover, in the weeks before the mediation, Defendants provided Plaintiff with several sets of detailed transactional data for virtual chip purchases; the Parties exchanged substantive briefing on the core facts, legal issues, litigation risks, and potential settlement structures; and the Parties supplemented that briefing with extensive written and telephonic correspondence, mediated and shuttled by the Phillips ADR team, clarifying each other's positions in advance of the mediation. *See id.* ¶ 8. On June 10, 2020, the Parties were able to reach agreement on an appropriate settlement amount, and negotiations continued over the following days until a final term sheet was executed. *See id.* ¶¶ 9-10. By then, the Parties were fully informed on all pertinent issues and capable of assessing the benefits of the settlement now before the Court. *See id.* ¶ 9; *Ikuseghan*, 2016 WL 3976569, at *3 (approving settlement reached "between experienced attorneys who are familiar . . . with the legal and factual issues of this case in particular"). This factor, too, thus supports final approval.

**F.    The reaction of the Settlement Class has been favorable.**

Finally, current claim data indicates that the Class has responded favorably to the Settlement, warranting final approval. Thus far, the Settlement Administrator has received more than 6,700 claims. Smitheman Decl. ¶ 18. Somewhat astoundingly, for a settlement of this size, and given the breadth of publication notice about the Settlement, nobody has opted-out and nobody has filed an objection. *Id.* ¶¶ 16-17. The absence of any opposition to the Settlement

1    speaks volumes regarding the fairness and adequacy of the Settlement. "When few class

2    members object, a court may appropriately infer that a class action settlement is fair, adequate,

3    and reasonable." *Schneider v. Wilcox Farms, Inc.*, No. 07-CV-01160-JLR, 2009 WL 10726662,

4    at *3 (W.D. Wash. Jan. 12, 2009). Courts in this district have found that class reaction supported

5    final approval even with significantly higher exclusion and objections rates. *See Pelletz v.*

6    *Weyerhouser Corp.*, 255 F.R.D. 537, 543-44 (W.D. Wash. 2009) (lauding "positive response" of

7    Settlement Class of 110,000 to 140,000 members where 19 excluded themselves from the

8    settlement, and 3 objected); *Clemans v. New Werner Co.*, No. 3:12-cv-5186, 2013 WL

9    12108739, at *5 (W.D. Wash. Nov. 22, 2013) (in settlement involving class of 300, one

10   objection and four exclusions were filed, court found that "the overwhelming non-opposition to

11   and participation in the Settlement [are] strong indications of Class Members' support for the

12   Settlement as fair, adequate, and reasonable."); *see also Rodriguez*, 563 F.3d at 967 (concluding

13   that the district court "had discretion to find a favorable reaction" when 54 of 376,301 class

14   members objected to settlement); *Churchill Vill.*, 361 F.3d at 577 (affirming approval of class

15   action settlement where 45 of 90,000 class members objected). Given the high participation rates

16   here, and total absence of any opposition to the Settlement, the Court should find that the

17   reaction of the Settlement Class favors final approval.[4]

18                                    **CONCLUSION**

19        The Court should finally certify the Settlement Class and grant final approval to the

20   instant Settlement.

21

22                                    Respectfully submitted,

23   Dated: December 14, 2020        By: /s/Alexander G. Tievsky

24                                    Alexander G. Tievsky
25                                    atievsky@edelson.com

26   _____

27   [4]    Consistent with the Court's order at Dkt. 124, Class Counsel intend to file a supplemental brief with final claims numbers and projected recoveries after the claims deadline and prior to the final fairness hearing.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370  •  Fax: 312 589 6378

EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370/ Fax: 312.589.6378

By: /s/Todd Logan

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300/Fax: 415.373.9435

By: /s/Cecily C. Shiel

TOUSLEY BRAIN STEPHENS PLLC
Cecily C. Shiel, WSBA #50061
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600

*Plaintiff's Attorneys and Class Counsel*
*Admitted *pro hac vice*